Charles G. SETTLES, Appellant,

v.

UNITED STATES, Appellee.

Willie F. WHITLEY, Jr., Appellant,

v.

UNITED STATES, Appellee.

Nos. 85–122, 85–271.

District of Columbia Court of Appeals.

Argued June 24, 1986.
Decided March 11, 1987.

Neal E. Kravitz, Washington, D.C., Public Defender Service, with whom James Klein, Washington, D.C., Public Defender Service, was on the brief, for appellant Settles.

Lawrence M. Baskir, appointed by this court, for appellant Whitley.

Mary Ellen Abrecht, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell and Alan D. Strasser, Asst. U.S. Attys., were on the brief, for appellee.

Before BELSON, TERRY, and ROGERS, Associate Judges.

TERRY, Associate Judge:

Appellants were charged in a thirteen-count indictment with armed kidnapping, armed rape, and related offenses. The charges were based on two separate incidents occurring ten days apart. A jury found both appellants guilty as charged on ten of the thirteen counts, and guilty of lesser included offenses under the other three. After one of the armed kidnapping verdicts was set aside by the court,[1] judgments of conviction were entered on the twelve remaining counts.[2]

Both appellants contend on appeal that the trial court erred in refusing to sever the charges relating to the first incident from the charges relating to the second. In addition, appellant Whitley argues that the evidence was insufficient to sustain his conviction of the second set of offenses as

---

**1.** The first count of the indictment charged the offense of armed kidnapping for the purpose of taking property of another; the second charged armed kidnapping of the same victim for the purpose of assaulting that victim. Since there was only one kidnapping, the two offenses merged. *See Thorne v. United States,* 471 A.2d 247 (D.C.1983).

**2.** Appellants were convicted of one count of armed kidnapping, D.C.Code §§ 22–2101 and

22–3202 (1981), two counts of kidnapping, § 22–2101, three counts of armed rape, §§ 22–2801 and 22–3202, one count of assault with intent to commit rape, § 22–501, one count of sodomy, § 22–3502, one count of attempted sodomy, §§ 22–103 and 22–3502, one count of armed robbery, §§ 22–2901 and 22–3202, one count of assault with a dangerous weapon, § 22–502, and one count of assault, § 22–504.

an aider and abettor of appellant Settles. We agree that the two sets of offenses were misjoined, and that the misjoinder was not harmless error; accordingly, we reverse both appellants' convictions on all twelve counts. We reject Whitley's claim of insufficient evidence.

I

A. *The April 7 Offenses*

At approximately 11:00 p.m. on April 7, 1984, a woman whom we shall call Mary Jones (not her real name) was on her way home from an errand when she stopped at a fast-food restaurant at Benning Road and East Capitol Street. She parked her car in the parking lot and went inside to purchase some fried chicken. As she was coming back across the parking lot, Jones noticed a man walking behind her and another man standing in front of her car. She entered the car and locked the door. She was about to start the engine when the first man, appellant Settles, knocked on her window and asked for fifteen cents. Jones said she did not have fifteen cents to give him and told him not to bother her. Just then she noticed that the other man, appellant Whitley, was still standing in front of the car. Feeling "a little nervous" about her situation, she decided to back her car out of the parking space; but when she did so, the car struck a pole. As she got out to inspect the damage, Whitley approached and remarked that it was serious.

Jones got back into her car, but before she could shut the door, Settles forced his way inside. She struggled with him until he pulled a gun and fired it, grazing her hair. She fell over into the passenger seat as Settles warned her not to look at him. Settles then told Whitley to get into the back seat, and as soon as he entered the car, Settles drove away, at the same time demanding money from Jones. She gave him $44 from her purse, throwing the rest of her money unobtrusively under the front seat.

Settles drove to an unlit wooded area behind 5411 D Street, S.E. After parking the car in a parking lot next to an apartment building, he ordered Jones to undress. When she refused, Settles put his gun to her head and threatened to kill her. She then took off her clothes, with the gun still pointed at her head and "clicking in [her] ear...." Settles began feeling her breasts and placed his finger into her vagina. Then he ordered her to lean over the back of the front seat, and when she did so, he raped her, as Whitley, who was in the back seat, simultaneously forced her to commit oral sodomy on him.[3] Settles then attempted anal intercourse before raping her a second time. After Settles had finished abusing her, he pushed her into the back seat and ordered her to do whatever Whitley wanted her to do. Whitley, following Settles' lead, got on top of her and raped her.

After Whitley had completed the sex act, the two men searched the car and found the money that Jones had hidden under the front seat. They took it, and also removed Jones' watch from her wrist and two rings from her fingers. Then Settles drove to a nearby housing project, where Whitley left the car for a few minutes while Settles remained with Jones. Moments later Whitley came back and reported that the people he had gone in to see were all out of cocaine and heroin. Settles drove to 53rd Street and Astor Place, S.E., where he and Whitley got out of the car. They allowed Jones to put her clothes back on and told her to leave, threatening to shoot her if she made any wrong turns. She heard a gunshot as she drove away. A police officer later found a bullet hole in the roof of the car and a small metal fragment on the front seat, which he said "could be" a bullet.

Jones immediately went home and called her fiance, who took her to the hospital. There she told a detective what had happened to her. She was also examined by a

---

**3.** Jones testified that throughout this ordeal she was crying. She had been forced to assume an awkward position, kneeling on the front seat with her head resting on the back seat. As Settles was engaged in the act of sexual intercourse, Whitley grabbed her head, lifted it up, and told her to stop crying, then forced her to sodomize him.

physician, and semen was found in her vagina which had characteristics of blood group O and an enzyme known as PGM–1. These characteristics were consistent with the blood of appellant Whitley. Semen found on the front seat of Jones' car did not reveal a blood type, which led an expert to conclude that it might have been left by a "non-secretor." Tests established that Settles was a non-secretor.

Jones later made positive photographic identifications of both Whitley and Settles, and also identified Settles in a lineup. She positively identified both men in court.

### B. *The April 17 Offenses*

At approximately 4:15 p.m. on April 17, 1984, a woman whom we shall call Gloria Smith (not her real name) was walking with her three-year-old son Kevin to her grandmother's house. They walked across a creek near 60th and East Capitol Streets, N.E. As they passed the rear of an apartment complex, two men suddenly approached them from behind. One of the men—appellant Settles—put his hand over Smith's mouth and shoved her into the basement of a nearby apartment building. Kevin, who had been holding his mother's hand, followed her into the basement. As she was being pushed inside, she turned around and saw appellant Whitley, whom she recognized as someone she had known from the neighborhood for at least fifteen years. His brother had formerly dated Smith's aunt, and Smith knew not only Whitley's name but also his exact address. From their behavior Smith concluded that Settles and Whitley were working in tandem. When Smith told Settles that she knew Whitley, Settles hit her in the back of the head and said, "Shut up; Whitley is not with me." Whitley was "right beside" Settles when this happened. Although Whitley did not go into the basement with the others, Smith testified that he stood "right outside of the door." When the prosecutor asked, "How do you know that?", she replied, "Because I saw him." On cross-examination Smith testified that Whitley was

"about three or four feet, I guess," from the door.

Inside the basement, Settles struck Smith in the face and on the back of the head. When her young son began to cry, Settles told her to "shut that boy up" and pushed him in the chest, but he did not stop crying. Settles then reached under Smith's dress and began to rub her breasts. He told her to bend over, but she could not because she was five months pregnant. Settles thereupon put his finger and then his penis into her vagina from behind, attempting to have sexual intercourse, while Kevin stood next to his mother holding her hand. After a short while Settles told Smith that he did not want to hurt her. Ordering her not to turn around, he walked over to the door and started to open it. Smith ignored his instructions, however, and turned to look at him. When she did, she recognized him as someone she had seen several times at a nearby store. Seeing that she was looking at him, Settles threatened her with a stick and told her to face the wall. He demanded her jewelry, but she did not have any. Then he opened the door and went outside. When Smith went to the door and looked out, she saw Settles and Whitley running away together, side by side.[4] She promptly went to a nearby telephone booth and called the police.

Smith made positive photographic identifications of both Whitley and Settles, and also identified Settles in a lineup. She positively identified both men in court.

Settles presented an alibi for each of the two incidents, claiming that he had been misidentified by the two victims. Whitley offered an alibi for April 7, but claimed innocent presence at the April 17 incident. The jury rejected all their defenses. In returning its verdict, the jury specifically found Whitley guilty as an aider and abettor on April 17.

4. Whitley never came inside the basement. Smith testified on cross-examination that she did not hear Whitley say anything while she and Settles were in the basement and Whitley was outside. Nevertheless, she insisted that "Mr. Whitley was watching. Mr. Whitley was his watch-out while Mr. Settles had me in the basement."

## II

Appellants were jointly indicted and tried on all thirteen counts arising out of the two incidents that occurred on April 7 and April 17. They do not contest the fact that they were tried together, nor could they; two or more defendants who "are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses" may be lawfully charged in the same indictment and jointly tried under Super.Ct.Crim.R. 8(b). Instead, appellants challenge the joinder of the April 7 offenses with the April 17 offenses.

■ Because both sets of offenses were "of the same or similar character," they would have been properly joined under Super.Ct.Crim.R. 8(a) if each appellant had been individually tried. "Rule 8(a) allows joinder of different offenses committed by one defendant." *Ray v. United States*, 472 A.2d 854, 857 (D.C.1984). But when two or more defendants are charged in the same indictment, Rule 8(a) does not apply. Instead, Rule 8(b) determines whether joinder is proper, regardless of "whether the issue is joinder of defendants or joinder of offenses." *Id.* (citations omitted). The distinction is crucial, because Rule 8(b) does not permit joinder of offenses "of the same or similar character," as Rule 8(a) does.[5] As we explained in *Ray:*

> Application of the proper subsection of Rule 8 may be consequential because Rule 8(a) joinder is more liberal than Rule 8(b) joinder: under [Rule] 8(a), offenses may be joined if they are either similar in character or based on the same

act or transaction, whereas under Rule 8(b), offenses may be joined only if they are based on the same act or transaction or series of acts or transactions.

*Id.; see also Cupo v. United States*, 123 U.S. App. D.C. 324, 326–327, 359 F.2d 990, 992–993 (1966), *cert. denied*, 385 U.S. 1013, 87 S.Ct. 723, 17 L.Ed.2d 549 (1967); *Ward v. United States*, 110 U.S.App.D.C. 136, 289 F.2d 877 (1961).[6] In this case, because the April 7 charges were not "based on the same act or transaction or series of acts or transactions" as the April 17 charges, we hold that the two sets of offenses were improperly joined.

■ Multiple offenses constitute a "series of acts or transactions" joinable under Rule 8(b) only if they fall into one of three categories: (1) where the offenses are committed to achieve "a specific common end," (2) "where one offense logically leads to another," or (3) "where the offenses are part of a common scheme or plan," and are so closely connected in time and place "that there is necessarily a substantial overlap in proof of the various crimes and 'it would be difficult to separate proof of one from the other.'" *Davis v. United States*, 367 A.2d 1254, 1262 (D.C.1976) (footnotes omitted); *accord, Wright v. United States*, 510 A.2d 223, 224 (D.C.1986); *Ray v. United States, supra,* 472 A.2d at 858. As Settles correctly points out in his brief, "these three classifications set forth the exclusive standards for proper joinder of offenses under Rule 8(b) in *all* multiple-defendant cases ..." (emphasis in original).

The record suggests that the trial court may not have fully appreciated the distinc-

---

**5.** Super.Ct.Crim.R. 8 provides in pertinent part:
 (a) *Joinder of offenses.* Two or more offenses may be charged in the same indictment ... if the offenses charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
 (b) *Joinder of defendants.* Two or more defendants may be charged in the same indictment ... if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts togeth-

er or separately and all of the defendants need not be charged in each count.

**6.** Although the *Cupo* and *Ward* cases arose under Fed.R.Crim.P. 8, the language of the federal rule is identical to that of the local rule which applies in this case. "We have repeatedly held that when a local rule and a federal rule are identical, we may look to federal court decisions interpreting the federal rule as 'persuasive authority in interpreting [the local rule].'" *Goldkind v. Snider Brothers, Inc.,* 467 A.2d 468, 472 (D.C.1983) (citations and footnote omitted); *see Davis v. United States,* 367 A.2d 1254, 1260 n. 8 (D.C.1976).

tion between Rule 8(a) and Rule 8(b). For example, in denying appellants' pretrial motion for severance on the ground of misjoinder, the court purported to apply Rule 8(b), stating that the April 7 and 17 incidents were part of a "common plan and/or scheme." During the trial, however, in response to a renewed motion for severance by Settles' counsel, the court stated:

Well, as I have indicated to you before, I believe 8(a) applies as well as 8(b) and there is some similarity. There are similarities [in] the sense that they are both rape counts. Basically that is sufficient for Rule 8 joinder, including both 8(a) and 8(b) and not just 8(b). But they are sufficiently dissimilar as ... not to constitute prejudicial joinder under Rule 14. So there you are. So your motion, all motions to sever ... are denied in the matter at this time.

■ In any event, regardless of any ambiguities in the trial court's ruling, it is clear from our holdings in *Davis* and *Ray* that the offenses were improperly joined. First, they were not committed to achieve "a specific common end." *Davis, supra,* 367 A.2d at 1262. The two sets of offenses did not depend for their furtherance or their success upon each other, nor were they related to a sufficiently specific common goal to satisfy Rule 8(b). "*Davis* emphasizes that the common goal must be 'specific' and explains further that offenses within [this first category] should depend for their furtherance or success on each other." *Ray, supra,* 472 A.2d at 858. In *Ray* we held that the proposed common goal of "obtaining property from others" was too broad to justify joinder under Rule 8(b). In this case likewise, the common goal of raping young women is far too broad to serve as a basis for joinder of the April 7 and April 17 offenses.

Second, the events of April 7 did not "logically lead to" the events of April 17. *Davis, supra,* 367 A.2d at 1262. The at-

tack upon Gloria Smith and her son on April 17 was not a necessary continuation of the abduction and rape of Mary Jones ten days before, and in no way did it logically or necessarily result from the earlier incident. Rather, the evidence makes clear that the two incidents were entirely unrelated. *See Ray, supra,* 472 A.2d at 858.

Finally, the two incidents were not "part of a common scheme or plan." *Davis, supra,* 367 A.2d at 1262. In particular, the offenses were not "so closely connected in time and place that necessarily proof of the two crimes overlaps substantially." *Ray, supra,* 472 A.2d at 858; *see Davis, supra,* 367 A.2d at 1262. We have repeatedly emphasized that the overlap of proof between the offenses must be "substantial" and "necessary" in order for multiple offenses to fit within this third type of "series of acts or transactions." *Ray, supra,* 472 A.2d at 858; *Davis, supra,* 367 A.2d at 1261. There is no such overlap here. Each of the two victims made positive in-court and out-of-court identifications of both appellants; thus proof of one incident was not necessary to prove the identities of perpetrators of the other incident. *Cf. Cox v. United States,* 498 A.2d 231, 238 (D.C. 1985) (denial of severance upheld when "the evidence of each crime offered a real contribution to the crucial issue of identity"). That the government presented its evidence at trial separately and distinctly, with no actual overlap of proof between the two offenses, further demonstrates that there was no evidentiary need for joinder. *See Davis, supra,* 367 A.2d at 1262 (requiring that separation of proof be difficult). Moreover, the two incidents were not closely connected in time or place; they took place at different times during the day, ten days apart. Nor was there any real congruence between the two incidents, but only a few superficial similarities.[7] What we said in *Davis* is equally true here:

---

7. On this point we specifically reject the government's argument. *Compare Tinsley v. United States,* 368 A.2d 531, 534 (D.C.1976) ("We find lacking here the concurrence of unusual and distinctive facts sufficient to conclude that a reasonable probability exists that the same per-

son committed both offenses"), *with Arnold v. United States,* 358 A.2d 335, 338 (D.C.1976) (en banc) ("while the two rapes here involved occurred at different times, the methods employed by the rapist in each case were strikingly sim-

[E]ach of the cases proved was in a sense a self-contained and separate account of a sordid event; there was virtually no overlap of testimony from one incident to another by a government witness.... [E]ach offense charged occurred at a different time of day and at a different place, [and] each complaining witness had her unique story to recount....

*Id.* at 1258–1259, 1261.

In sum, there was no specific common end toward which all of the acts alleged in the indictment were directed, nor did one set of offenses logically lead to or depend on the other. Furthermore, there was no necessary and substantial overlap of proof between the two sets of offenses. Thus the joinder of the April 7 offenses with the April 17 offenses cannot be justified on any of the three grounds set forth in *Davis* and subsequent cases.

### III

The government contends that even if there was a misjoinder, it was harmless. We do not find it harmless as to either appellant.

■ Although there has been some disagreement among the courts on whether a misjoinder under Rule 8 (b) could ever amount to harmless error, this court has traditionally applied a harmless error test to misjoinder claims. *See, e.g., Ray, supra,* 472 A.2d at 859; *Davis, supra,* 367 A.2d at 1263. The Supreme Court has recently held that a misjoinder under FED.R.CRIM.P. 8 (b)[8] is subject to harmless error analysis and is not reversible error *per se. United States v. Lane,* —— U.S. ——, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986); *see also Wright v. United States, supra.* Misjoinder is harmless, however, only if it has no "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United States,* 328 U.S. 750, 776, 66

S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946), quoted in *Lane, supra,* 106 S.Ct. at 732. In practical effect, this language generally means that a misjoinder may be deemed harmless only "if all or substantially all of the evidence of one offense would be admissible in a separate trial of the other." *Ray, supra,* 472 A.2d at 859 (citations omitted). The reason for this is self-evident. If the offenses are mutually admissible, there can be no danger of prejudice in trying the cases together rather than separately "because in either event the jury will hear all about both crimes." *Id.* If they are not mutually admissible, however, reversal may be required, *see United States v. Chinchic,* 655 F.2d 547, 551 (4th Cir. 1981), because "a presumptive possibility of prejudice" results from improper joinder. *King v. United States,* 355 F.2d 700, 703 (1st Cir.1966), quoted in *Davis, supra,* 367 A.2d at 1254; *see Ray, supra,* 472 A.2d at 859; *Cupo, supra,* 123 U.S.App.D.C. at 327, 359 F.2d at 993.

It may be a bit misleading to speak of "mutual" admissibility when discussing harmless error; admissibility need not always be mutual as a prerequisite to a finding of harmlessness. While in most cases involving two offenses, neither offense will be admissible to prove the other, there will occasionally be instances in which offense B may be inadmissible in a trial for offense A, but offense A may be admissible in a trial for offense B. Thus a misjoinder under Rule 8(b) may be partially harmless and require only a partial reversal; *i.e.,* the conviction of offense A must be reversed, but the conviction of offense B may be affirmed. The government argues that this is the situation here, at least with respect to Whitley.

To determine whether evidence of either offense would be admissible in a separate trial for the other, we look for guidance to *Drew v. United States,* 118 U.S.App.D.C.

---

ilar"). We find the instant case much closer to *Tinsley* than to *Arnold.*

The trial judge apparently had the same view *of the case.* After hearing all of the government's evidence, the judge declared:

Well, I don't think there is any similarity between those two incidents at all, not even as

it relates to one as opposed to the other. There are numerous differences between these matters, and there is no logical basis that I know of for anybody to assume that whoever did one did the other.

**8.** See note 6, *supra.*

11, 331 F.2d 85 (1964). *Drew* holds that, in general, evidence of other crimes is admissible only if it is more probative than prejudicial, and if it is "relevant to (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other, and (5) the identity of the person charged with the commission of the crime on trial." *Id.* at 16, 331 F.2d at 90 (footnote omitted).[9] Otherwise, other-crimes evidence is presumed to be unduly prejudicial. *Tinsley v. United States, supra* note 7, 368 A.2d at 533.

■ With respect to Settles, and in part with respect to Whitley, we conclude that none of the five *Drew* exceptions apply here. Both appellants presented alibi and misidentification defenses to the April 7 charges, and Settles to the April 17 charges as well. Thus Settles' state of mind was not in issue at all, nor was Whitley's as to the events of April 7. Consequently, neither offense was admissible to prove motive, intent, or absence of mistake on Settles' part as to the other, nor was the April 17 offense admissible to prove Whitley's motive, intent, or absence of mistake on April 7. *Campbell v. United States,* 450 A.2d 428, 431 (D.C.1982); *Robinson v. United States,* 317 A.2d 508, 513–514 (D.C. 1974).[10] Identity is also not an applicable *Drew* exception, as the trial court recognized in ruling that "there is no logical basis ... for anybody to assume that whoever did one [crime] did the other" (see note 7, *supra* ). On the facts of this case, we simply cannot say that the two incidents were "so distinctive and unusual that there is a reasonable probability that the same person committed both offenses." *Evans v. United States,* 392 A.2d 1015, 1020 (D.C.1978) (citations omitted). Final-

ly, the common scheme or plan exception does not apply. As we have already discussed, the two incidents do not meet the common scheme or plan test under *Davis.* Moreover, neither incident is relevant to explain the circumstances surrounding the other incident, *see Toliver v. United States,* 468 A.2d 958, 960–961 (D.C.1983) (citing cases), nor is either probative of appellants' preparation for the other. *See Payne v. United States,* 111 U.S.App.D.C. 94, 96–97, 294 F.2d 723, 725–726, *cert. denied,* 368 U.S. 883, 82 S.Ct. 131, 7 L.Ed.2d 83 (1961).

■ Our conclusion that the misjoinder was not harmless is bolstered by the actual prejudice which we find in this case. Although there are no unusual and distinctive facts tying the two incidents together, some similarities do exist between the two sets of offenses. For example, both victims were abducted by two men acting in concert, then sexually assaulted by at least one of them. Such similarities raise a serious risk that the jury may have cumulated the evidence against both appellants. As we noted in *Tinsley:*

> Once the "identity exception" to the "other crimes" rule has been rejected, the points of potential similarity cut the other way. Every suggestion at trial that the two crimes were in some way similar increased the likelihood that the jury became confused or misused the evidence.

*Tinsley v. United States, supra* note 7, 368 A.2d at 536–537 (citation omitted). The danger of cumulation and misuse of evidence is heightened when, as in this case, the two incidents involve rape or attempted rape. "[W]hen joinder is sought involving crimes such as rape, the risk of prejudice is substantial." *Bridges v. United States,*

---

9. In a footnote the court pointed out that these five exceptions to the rule against admissibility of other-crimes evidence "are variously stated by the different authorities and this list is not necessarily all-inclusive. These are, however, the major exceptions." *Drew, supra,* 118 U.S. App.D.C. at 16 n. 10, 331 F.2d at 90 n. 10 (citation omitted); *see also, e.g.,* FED.R.EVID. 404(b) (listing eight exceptions).

10. Although we agree with the government that the evidence of Whitley's participation in the April 7 incident was relevant to the issue of his intent on April 17, we also conclude that the prejudice resulting from the admission of this evidence outweighed its probative value. Consequently, even though it came within one of the five *Drew* exceptions, it was inadmissible. See page 356, *infra.*

381 A.2d 1073, 1078 (D.C.1977), *cert. denied*, 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 141 (1978).

Whitley's defense of innocent presence at the scene of the crime on April 17, combined with the government's evidence linking Settles and Whitley together in the April 7 incident, substantially reduced any chance of success that Settles might otherwise have had with his alibi defense to the April 17 charges. Given the evidence of Settles' collaboration with Whitley in the abduction and rape of Mary Jones on April 7, "it [was] but a small step for the jury to infer" from Gloria Smith's testimony about the events of April 17—particularly her strong identification of Whitley, whom she had known for fifteen years, as Settles' companion—that the man who assaulted her in the basement was in fact Settles. *Davis, supra*, 367 A.2d at 1263–1264. Thus the record establishes that Settles was affirmatively prejudiced by the misjoinder, so that we cannot find harmless error as to him.

█ As to Whitley, the government maintains that the misjoinder was at least partially harmless. It argues that even if the April 17 incident was inadmissible to prove the April 7 charges, the April 7 incident was admissible under *Drew* to prove that Whitley had the intent to aid and abet Settles on April 17, thereby rebutting Whitley's defense of innocent presence on the latter date. Therefore, the government contends, Whitley's conviction of at least the April 17 offenses should be affirmed. We cannot agree. Even though other-crimes evidence may fall within one of the *Drew* exceptions, "it must still be excluded by the trial court when the degree of prejudice exceeds the probative value of the

evidence." *Campbell v. United States, supra*, 450 A.2d at 430 (citations omitted); *accord, e.g., Bigelow v. United States*, 498 A.2d 210, 214 (D.C.1985). The government is correct in asserting that the fact of Whitley's joint involvement with Settles in the April 7 rape would be admissible under *Drew* to prove Whitley's intent at a trial for the April 17 offenses. Perhaps some skeletal facts showing that he was more than a casual participant on April 7 might also be relevant. In the probative-prejudicial balancing process, however, the admission of all the gruesome details of the April 7 incident tips the balance too far toward prejudice. *Cf. Ward v. United States*, 386 A.2d 1180, 1182 (D.C.1978) ("the fact of conviction" is admissible for impeachment under D.C. Code § 14–305 (1981), but "the facts of the crime" are not). Thus we decline to find harmless error as to Whitley and hold that he, as well as Settles, is entitled to a new trial.[11]

### IV

Whitley also contends that the evidence was insufficient to support his conviction as an aider and abettor of Settles in the offenses committed on April 17. He argues that the evidence shows only three things: first, that he was walking with Settles shortly before Settles confronted Gloria Smith; second, that he was standing in the immediate vicinity when Settles grabbed Smith and pulled her into the basement; and third, that he fled with Settles shortly thereafter. At the heart of his claim of error is the assertion that Smith's testimony that he stood "right outside of the door" was a mere assumption, and her statement that he acted as a lookout was a

---

11. In addition to the mutual-admissibility factor discussed in *Ray*, which remains of the utmost importance, the Supreme Court in *United States v. Lane* considered two other factors that may affect whether a misjoinder under Rule 8(b) can be deemed harmless error: first, whether the government presented "overwhelming evidence of guilt," in which case the misjoinder might well be harmless; and second, whether a "proper limiting instruction" was given at the appropriate time. *Lane, supra*, 106 S.Ct. at 732. The evidence in this case was less than "overwhelming," since it consisted exclusively of the testi-

mony of the two victims, along with some fairly weak scientific evidence related to the first incident. As for the instructions, the jury was properly instructed to consider the evidence as to each incident separately from the other. Nevertheless, in light of not only the potential for prejudice inherent in the misjoinder but the actual prejudice apparent on the record, we believe that the court's instructions were "inadequate to prevent prejudice." *Id.* at 733 n. 13. Thus, in this case at least, the additional factors considered in *Lane* do not affect our analysis under *Ray*.

conclusory opinion with no factual predicate.

■ "In order to aid and abet another to commit a crime, it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.'" *Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949), quoting from *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir. 1938). Mere presence at the scene of the crime, without more, is generally insufficient to prove involvement in the crime, *e.g., Creek v. United States,* 324 A.2d 688, 689 (D.C.1974), but it will be deemed enough "if it is intended to [aid] and does aid the primary actors." *Bailey v. United States,* 135 U.S.App.D.C. 95, 98, 416 F.2d 1110, 1113 (1969) (footnote omitted). *Compare Perry v. United States,* 276 A.2d 719 (D.C.1971) (mere presence), *with Forsyth v. United States,* 318 A.2d 292 (D.C.1974) (presence coupled with flight and other circumstances). "Presence is thus equated to aiding and abetting when it is shown that it designedly encourages the perpetrator, facilitates the unlawful deed—as when the accused acts as a lookout—or where it stimulates others to render assistance to the criminal act." *Bailey, supra,* 135 U.S. App.D.C. at 98–99, 416 F.2d at 1113–1114 (footnotes omitted).

In *Bailey* the defendant and another man, who was never identified, had been seen together one afternoon shooting craps across the street from the Center Market Provision Company, a wholesale meat distributor. A short time later, when an employee of the market came outside, he noticed Bailey and his crap-shooting companion standing next to a truck in the parking lot. The employee was carrying a paper bag with the day's receipts in it, more than $4,000, which he was to deposit in the bank the next day. When the employee reached his car, Bailey's companion took the paper bag at gunpoint. Just before this happened, however, Bailey walked over to the curb, about ten feet away. When someone yelled, "Look, they're robbing him," Bailey

and the other man both ran away in the same direction. Bailey's conviction of aiding and abetting the robbery was reversed by the Court of Appeals on the ground that the case was "devoid of evidence, beyond what the previous associative acts and the subsequent flight might themselves reflect, that appellant's presence on the scene was designed ... in any way [to] sanction or promote the robbery." *Id.* at 99, 416 F.2d at 1114.

■ Appellant Whitley argues that the evidence against him in this case was no stronger than the evidence in *Bailey* —"presence at the scene of the crime, slight prior association with the actual perpetrator, and subsequent flight." *Id.* at 98, 416 F.2d at 1113. According to Whitley, there was no additional evidence which showed that he in any way aided or abetted the crimes of Settles on April 17, and that the evidence at most raised a suspicion that he acted as a lookout. Hence he maintains that he was entitled to a judgment of acquittal on the April 17 charges because, although "[t]he circumstances may arouse suspicions ... even 'grave suspicion is not enough.'" *Id.* at 101, 416 F.2d at 1116 (footnote omitted); *see Quarles v. United States,* 308 A.2d 773, 775 (D.C.1973) ("suspicion, even strong suspicion, is no substitute for probative evidence of guilt"); *United States v. Eaton,* 485 F.2d 102, 109 (10th Cir.1973) ("conjecture ... and surmise" that defendant aided and abetted bank robbers was insufficient to prove guilt); *Jones v. Commonwealth,* 208 Va. 370, 157 S.E.2d 907 (1967) (evidence that accused was with perpetrator prior to robbery and burglary, was present during commission of offenses, and fled in order to escape arrest was insufficient to convict him as aider and abettor).

Although the case is a close one, we are persuaded that the evidence of Whitley's participation was sufficient under *Creek v. United States, supra.* In *Creek* the complainant had parked her car on a side street near her house when she noticed three young men walking together in her direction. She was about to unlock the front door to her house when suddenly one of the

three young men grabbed her pocketbook and started to run. "She turned and saw his two companions watching just outside the gate, slightly crouched. As the purse-snatcher made his exit, they ran with him down the street." 324 A.2d at 689. Creek, one of the companions who were crouching outside the gate, was convicted of aiding and abetting the robbery, and on appeal this court affirmed his conviction. "The inference that appellant's presence by the gate 'designedly encouraged' or 'facilitated' the robbery is clearly warranted." *Id.* We found it significant that Creek did not "avail himself of opportunities to withdraw from the scene of the criminal activity," and concluded that although the government did not prove actual participation in the robbery, Creek's " 'continued presence ... gave tacit approval and encouragement.' " *Id.* at 690, quoting from *In re T.J.W.,* 294 A.2d 174, 176 (D.C.1972).

Reading the record in light of our decision in *Creek,* we are satisfied that Whitley's conviction on the April 17 charges is based on more than mere conjecture and speculation. In addition to the evidence that Whitley was with Settles before the crime, was present during the crime, and fled with Settles after the crime, there is strong evidence that Whitley must have had actual knowledge that a crime was being committed, but that he did nothing to disassociate himself from the criminal activity. For example, on direct examination Gloria Smith testified that before being pushed into the basement by Settles, she said "I know Whitley," which prompted Settles to hit her in the head and tell her to shut up. Settles then shoved her and her son into the basement, but Whitley, who was standing next to Settles, did nothing. Additionally, Smith's testimony that Whitley was standing "right outside of the door" was not based on conjecture, as Whitley now maintains, but on the fact that she "saw him," as she stated in response to the prosecutor's very next question. Once inside the basement, with Whitley standing *just outside* the door, Settles put his hand over Smith's mouth and told her to shut up because she was talking too much. When she told Settles that she did not "have

anything," meaning money or other valuables, the first thing Settles did was to hit her in the back of the head. Throughout the events in the basement, Smith's son "kept hollering," "screaming and crying [because] he was scared." Since Smith's testimony placed Whitley within three or four feet from the partially open basement door, a reasonable juror could readily infer that he heard everything that was going on inside.

The fact that Whitley fled with Settles also supports an inference that he knew what Settles had been doing inside the basement, and the only way he could have known that was by standing outside the door throughout the entire sequence of events, or at least a substantial part of it. Thus the jury could find that by not availing himself of opportunities to withdraw from the scene, he gave his tacit approval and encouragement to what Settles was doing. *See Creek, supra,* 324 A.2d at 690; *In re T.J.W., supra,* 294 A.2d at 176; *People v. Fuller,* 91 Ill.App.3d 922, 928, 47 Ill.Dec. 497, 503, 415 N.E.2d 502, 508 (1980) ("If a defendant is present at the scene of a crime without opposing or disapproving the acts, the trier of fact can, in consideration of all the circumstances, infer that he has consented to those acts, and has aided and abetted them"). His presence outside the door would certainly have been a strong deterrent to any attempt by the victim to escape. Indeed, he was in a position not only to prevent an escape but also to warn Settles if anyone approached. From his conduct the jury could reasonably conclude that Whitley knowingly associated himself with the criminal venture and by his actions helped to make it succeed. *United States v. Lumpkin,* 145 U.S.App.D.C. 162, 167, 448 F.2d 1085, 1090 (1971). "The inference that appellant's presence by the [basement door] 'designedly encouraged' or 'facilitated' the [assault] is clearly warranted." *Creek, supra,* 324 A.2d at 689.

*Creek* is distinguishable from *Bailey* in one important respect. In *Bailey* the defendant walked away from the truck just before his companion committed the robbery, thus taking some action, albeit limit-

ed, "to withdraw from the scene of the criminal activity." *Creek, supra,* 324 A.2d at 690. The defendant in *Creek,* however, made no effort to withdraw from the criminal activity, but stayed "slightly crouched" by the gate as his companion snatched the victim's purse. In this case Whitley never attempted to disassociate himself from the ongoing criminal activity of Settles during the entire ten minutes or so that Settles was assaulting Gloria Smith. That fact convinces us that *Creek,* rather than *Bailey,* is the controlling precedent here. Viewing the evidence in the light most favorable to the government, as we must,[12] we hold that under *Creek* the evidence was sufficient to convict Whitley of aiding and abetting the offenses committed by Settles on April 17.

### V

The convictions of both appellants on all counts are reversed. The case is remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

Statement of Associate Judge BELSON, concurring in part and dissenting in part:

I join in the opinion of the court, except with respect to the reversal of Whitley's conviction of the rape (and related offenses) that occurred on April 17, 1984, the second of the two rapes of which the jury convicted appellants. I would affirm Whitley's conviction of that rape, because its misjoinder with the earlier rape was harmless as to Whitley.

As the majority opinion points out:

> While in most cases involving two offenses, neither will be admissible to prove the other, there will occasionally be instances in which offense B may be inadmissible in a trial for offense A, but offense A may be admissible in a trial for

offense B. Thus a misjoinder under Rule 8(b) may be partially harmless and require only a partial reversal; *i.e.,* the conviction of offense A must be reversed, but the conviction of offense B may be affirmed.

Majority at p. 354. The majority concedes that "the fact of Whitley's joint involvement with Settles in the April 7 rape would be admissible under *Drew* to prove Whitley's intent at a trial for the April 17 offenses." Majority opinion at 18. But it reverses Whitley's conviction because the jury heard "all the gruesome details" of the earlier rape and, it reasons, the application of the probative-prejudice balancing process required exclusion.[1] It is with this last conclusion that I disagree.

We deal here with the question of harmless error in a joinder situation. Inevitably, where there has been joinder, the entirety of the evidence of the commission of each joinder offense will come before the jury. If we should postulate that error may be found to have been harmless only where the jury was made aware solely of the fact of the other offense, but not the details of its commission, we would virtually foreclose the application of harmless error analysis to misjoinder.

The correct approach, in my view, is to weigh harmlessness in misjoinder situations in light of the reality that in such instances we will be dealing usually with trials in which all the evidence regarding the other offense came to the attention of the jury. We should not presume that the infliction of harm usually follows from the presentation of the facts of the offense, but instead should look to the overall impact of the joinder of the one offense upon the jury's consideration of the other.

Viewing this case in that light, what stands out most clearly is that Whitley's participation in the first of the two rapes is

---

12. *E.g., McClain v. United States,* 460 A.2d 562, 567 (D.C.1983).

1. The authority cited by the majority for the proposition that admission of all the details of the April 7 incident "tips the balance too far toward prejudice" is *Ward v. United States,* 386 A.2d 1180, 1182 (D.C.1978). But referring to the

holding of *Ward* does little to advance the analysis here, because *Ward* involves impeachment by previous conviction, rather than joinder. It is well established, for a variety of good reasons, that only the fact of the previous conviction rather than the details of its commission is admissible to impeach.

enormously probative of the reason for his presence at the second. Its devastating effect on Whitley's defense of the second rape arises primarily from its probativity rather than from the details of the first rape. Once the jury was aware that Whitley had worked together with Settles to rape another woman a mere ten days before the April 17 incident, Whitley's innocent presence defense went up in smoke.

The prejudice to Whitley, on the other hand, was not significantly more than must normally attend proof that one was involved in another rape. While the details of the first rape are repugnant, jurors know that this is frequently true of the offense of rape, especially when two offenders join in the crime. I think we must conclude on this record that the probative-prejudice balance is strongly in favor of admission of the evidence of the first rape, and that the error in joinder was harmless as to Whitley's conviction of the second rape.