670 A.2d 895 (1996)
In re T.H.B., Appellant.
No. 92-FS-1369.
District of Columbia Court of Appeals.
Argued March 24, 1994.
Decided January 25, 1996.
*897 Judith A. Lovelace, Washington, DC, appointed by this court, for appellant.
Phillip A. Lattimore, III, Assistant Corporation Counsel, with whom John Payton, Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellee.
Before FERREN, TERRY, and KING, Associate Judges.
TERRY, Associate Judge:
Appellant, a juvenile, was charged with armed robbery and assault with intent to kill while armed. He was adjudicated delinquent after the trial court found him guilty of one count of assault[1] and one count of assault with intent to commit robbery.[2] On appeal he argues that the trial court erred in permitting the government to introduce evidence of uncharged misconduct, and that the government presented insufficient evidence to support a finding that he had any intent to rob the victim. These arguments are without merit. In addition, appellant argues that the simple assault merges with the assault with intent to commit robbery. We agree with this argument, but not for the reasons that appellant offers.[3] Rather, we hold that the two assaults of which appellant was found guilty were, in fact and in law, only a single offense. Accordingly, to the extent that the delinquency adjudication was based on a finding that appellant was guilty of simple assault, we vacate it in part as duplicative. In all other respects the adjudication is affirmed.

I
The government's principal witness was Lonnie Bryant. He testified that on October 28, 1989, at approximately 10:00 p.m., a group of young men gathered in the 5400 block of Ninth Street, N.W. Appellant, who went by the nickname "Grumpy," was a member of the group. Someone other than appellant suggested that they "all get together and beat up a pipehead."[4] This proposal met with general agreement, and soon thereafter several of the youths attacked an unidentified pedestrian. During this incident appellant was standing "over to the side" near a fence, about five feet away. The attack suddenly ended when somebody cried "D.C. Police," prompting the members of the group, including appellant, to run into a nearby house.[5]
A few minutes later the youths returned to the street, and at about the same time two men came walking down the street toward them. One of the two, Charles Lawson, approached one of the young men and asked whether anybody was "working," i.e., selling drugs. The others in the group, including appellant, gathered in a circle around Mr. Lawson to prevent him from running away, and one of the young men, known as Robbie *898 or Robert, struck Lawson in the face and knocked him unconscious.[6] Then someone in the group stood over Mr. Lawson and urinated on him,[7] and another person (not identified by name or nickname) spat on him as he lay on the ground. One of the youths, Michael Atkins, then bent over and went through the pockets of Mr. Lawson's jacket, removing an unidentified object which he placed in his own pocket. While all this was going on, the other young men "started separating and started backing up," according to Bryant, but they remained in the immediate vicinity. Some of the others began clamoring to arouse the still-unconscious Lawson and "get him up off the street"; appellant, in particular, said, "Get that [man] up before the police drive past here." Appellant then ran into the same house where he had gone before, supposedly to get some water to "throw on the guy to wake him up."[8]
Mr. Lawson had regained consciousness and was sitting up by the time appellant returned (without any water).[9] Appellant then helped Lawson to collect his personal belongings, which had been scattered during the attack, and appellant and the others tried to persuade him to leave and "go up the street." At the same time, another member of the group, known as Kirky, walked over to a nearby car and got in. Then, just as Mr. Lawson, still in a dazed condition, drifted into the street, Kirky drove past and grabbed him. Kirky pulled Lawson toward the car, shot him once in the buttocks, then pushed him away and drove off. After the shot was fired, the group disbanded. According to Bryant, Kirky was not part of the group that initially planned to "beat up a pipehead." However, he arrived on the scene shortly thereafter and was present during the assault on the unidentified pedestrian as well as the assault on Mr. Lawson.
On cross-examination Bryant testified that he did not see appellant talking with Kirky that evening, nor was Bryant aware of any plan to shoot Lawson. In addition, according to Bryant, at the time of the shooting appellant was standing in front of a nearby house, roughly eighteen feet away from the incident. Bryant also testified that, when the initial beating of Mr. Lawson began, appellant was standing near a fence, again approximately eighteen feet away.
The government introduced a videotape of these events which had been taken by one or more of the assailants. Although the tape ended shortly before Mr. Lawson was shot, it depicted appellant's attempt to get Lawson up on his feet and later showed appellant tossing a jacket to Lawson. While the tape was being played, Bryant identified appellant as the person shown on the tape whose foot was "touching the back of [Lawson's] head" as Lawson lay on the ground. Appellant's voice was also recorded on the tape saying, "I'm going to hit [Lawson's] ass if he don't get up."
At the close of the government's case, defense counsel moved for a judgment of acquittal. The court granted the motion with respect to the weapon-related elements of both counts, but denied it as to the lesser included offenses of robbery and assault.
Appellant then testified on his own behalf. He admitted that he was present on the night of October 28 and that he saw the attack on the unknown first victim, but he said that the others were merely "playing with him." A few minutes later Mr. Lawson and his friend approached the group and asked, "Do you have some?" A young man named Quentin exclaimed, "We got two live ones. We got two live ones." Robbie thereupon struck Lawson in the face and knocked *899 him down while Lawson's companion escaped. Appellant then saw Kirky and Quentin urinate on Lawson, one after the other, and Atkins began to go through the pockets of Lawson's jacket.[10] During this entire time, appellant said, he was standing in front of a fence near a house.
Eventually appellant and an unidentified woman came to Mr. Lawson's assistance by helping him up and handing him his jacket. According to appellant, it was at this point that he went into the house to get some water for Lawson. Then, as he was emerging from the kitchen door with a pot of water, he heard two gunshots. Frightened, he dropped the pot and ran away. Appellant denied that he ever agreed to assault anyone that evening and insisted that he never put his hands in Lawson's pockets at any time.
After hearing all the evidence, the court found appellant guilty of aiding and abetting in the assault on Mr. Lawson, that is, the punch in the face and the urination. The court specifically credited Bryant's testimony over appellant's in finding that appellant had participated in the original plot "to have some fun and beat up some pipeheads" that evening. The court also found, after viewing the videotape once again, that appellant was much closer to the attack on Lawson than even Bryant had said in his testimony. "[H]e was standing right with the others when the second victim [Lawson] . . . came onto the scene. Indeed, the tape shows that he was not eighteen feet away. . . . He was more like three feet away." Combining the videotape and Bryant's testimony, the court found appellant guilty of assault on the theory that he had aided and abetted "the original assault" on Mr. Lawson.
With respect to the charge of robbery, the court found that appellant was "standing right there looking as [Atkins went] through the unconscious man's pockets while he [was] spread out unconscious on the ground." Appellant's attempt to revive the fallen Lawson was construed by the court not as motivated by "any kind of Good Samaritan spirit," but simply as a recognition
that this is a body on the ground that's been knocked out that could be inconvenient to have in the neighborhood, because the police might wonder who was involved in this and come looking for people, so they need to get him out of there.
The court also referred to a scene on the videotape where someone said, "Hit him [Lawson] in the head. Move his head. Wake him up. Get him out of here." The tape then showed that in response to these comments, appellant's foot "kind of pushed" at Lawson's head. The court thus found that appellant was "an integral part of the cleanup. . . by trying to get this man out of the neighborhood" before the police came. However, the court also found that the evidence was insufficient to prove that Atkins ever took anything of value from Mr. Lawson. Accordingly, on the robbery charge, the court found appellant guilty as an aider and abettor of the lesser included offense of assault with intent to commit robbery.[11] With respect to the shooting of Lawson by Kirky, the court made no finding whatsoever.

II
The petition charging appellant with delinquency contained two counts, which read as follows:
[1.] [S]aid child, on or about October 28, 1989, within the District of Columbia, while armed with a dangerous weapon, that is, a gun, by force and violence, against resistance and by putting in fear, stole and took from the person and from the immediate actual possession of Charles Lawson, property of value, consisting of U.S. currency, in violation of D.C.Code § 22-2901 and D.C.Code § 22-3202.

*900 2. Said child, on or about October 28, 1989, within the District of Columbia, while armed with a dangerous weapon, that is, a gun, assaulted Charles Lawson with intent to kill him, in violation of D.C.Code § 22-501 and D.C.Code § 22-3202.
In other words, the first count charged appellant with armed robbery, and the second count charged assault with intent to kill while armed.
In light of the record as a whole, we conclude that the first count of the petition relates to appellant's participation in the entire first phase of the incident involving Mr. Lawson, from the moment Lawson was surrounded by the group of youths up to and including the time when Michael Atkins was seen going through Lawson's pockets. In ruling on appellant's first motion for judgment of acquittal at the conclusion of the government's case, the trial court granted the motion with respect to the "armed" part of the armed robbery count, leaving only a charge of robbery. At the end of the trial, the court further ruled that the government's evidence failed to establish that the item taken from Mr. Lawson's pocket was of any value, but found appellant guilty of the lesser included offense of assault with intent to commit robbery. We find no reversible error in any of these rulings.
The second count, however, presents a problem. In ruling on the first motion for judgment of acquittal, the trial court seemed to suggest that the second count related to the initial episode of assaultive conduct against Mr. Lawson, consisting of the punch in the face and the urination, "all the various actions taken during the . . . course of these events." While this statement leaves open the possibility that the court was treating the entire episode  including the shooting by Kirky  as one assaultive act, the court's ultimate verdict was not entirely consistent with these earlier comments. In delivering its ruling, the court noted that appellant
aided and abetted by his presence . . . the original assault on the second victim [Lawson], that is to say, when ... the victim, for example, was struck in the face, although that was only one of the things that happened to him, certainly the urinating would be a second assault on him, but the assault that he aided and abetted by his presence, the assault that occurred.
The court then discussed the robbery count without ever mentioning the shooting committed by Kirky. Thus it appears that the trial court construed the first count of the petition as pertaining to the purported robbery and the second count as applying to the punching and urination. We hold, however, that the entire first incident, up to and including Atkins' removal of an object from Lawson's pocket, constituted one single assault rather than two separate assaults.
We are led to this conclusion by the line of cases holding that when the evidence establishes "a continuing course of assaultive conduct," rather than "a succession of detached incidents," the defendant is properly charged with only one count of assault. Glymph v. United States, 490 A.2d 1157, 1160 (D.C.1985); see Gray v. United States, 544 A.2d 1255, 1258 (D.C.1988) ("A continuing course of conduct may be found even though there has been some spatial or temporal separation between assaultive acts ... or interruption by outsiders or actions by the participants themselves"); Owens v. United States, 497 A.2d 1086, 1096 (D.C.1985) (noting that certain offenses, like assault, "tend to be committed in a single continuous episode rather than in a series of individually chargeable acts"), cert. denied, 474 U.S. 1085, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986). Thus in Glymph this court held that the appellant, who had engaged in an hour-long argument with his girl friend during which he hit her several times, stuffed a washcloth in her mouth, threw her to the floor, and threatened her with a baseball bat, had committed only a single assault. 490 A.2d at 1160-1161.
The reasoning of Glymph and similar cases applies in the case at bar. The initial series of offenses committed against Mr. Lawson  the punch in the face, the urination, and the rummaging through his pockets  occurred in rapid succession. In addition, the nature of appellant's participation remained the same during this initial phase. Moreover, while the identity of the principal offender changed from moment to moment, *901 all of the offenders were acting pursuant to the original plan to beat up any would-be drug buyers ("pipeheads"), so that they were all aiding and abetting one another. Thus we conclude that the trial court's two findings of guilt both relate to the crime charged in the first count of the delinquency petition.
The second count, on the other hand, charged appellant with assault with intent to kill while armed. This charge could only have referred to the shooting of Mr. Lawson by the person known as Kirky, which was separated from the other events by a brief but appreciable period of time. See Spain v. United States, 665 A.2d 658, 661 (D.C.1995); Owens, supra, 497 A.2d at 1095-1097 (affirming two separate assault convictions because they were "based on two separate criminal acts, one of which ended before the other began"). There was no evidence at all that appellant was involved in that shooting in any way. Lonnie Bryant, the government's main witness, did not connect appellant with the shooting, nor did he even see appellant talking with Kirky. Bryant testified that Kirky, unlike the principal offenders who punched and urinated on Mr. Lawson, was not part of the initial group that decided to "beat up a pipehead." According to Bryant, Kirky did not arrive on the scene until the assault on Lawson was already in progress. He displayed his pistol to Bryant and another youth named Robert, but at that time appellant was standing on a street corner a considerable distance away. Nor did the videotape tie appellant to the shooting because it ended before the shooting took place. The trial court's detailed findings of guilt at the end of the trial did not even mention the shooting. Thus we conclude that the shooting of Mr. Lawson played no part in the adjudication of delinquency.
We hold accordingly that the two offenses of which appellant was found guilty merge into a single offense  more precisely, the simple assault merges into the assault with intent to rob  and that the two separate guilty verdicts were redundant. Our next task is to address appellant's contention that the evidence was not sufficient to permit the court to find him guilty of assault with intent to commit robbery.

III
Appellant asserts that the government presented insufficient evidence to support a finding that he assaulted Lawson with the intent to rob him. In particular, appellant argues that the government failed to establish that robbery was part of the initial agreement, and that no actual robbery was ever proven. What this argument overlooks is that appellant was charged and found guilty as an aider and abettor, and for that reason we must consider not appellant's specific intent but the intent of the principal offender, who in this instance was Michael Atkins.
"The oft-recited elements of aiding and abetting are: (1) that the offense was committed by someone, (2) that the accused participated in the commission, and (3) that he did so with guilty knowledge." West v. United States, 499 A.2d 860, 865 (D.C.1985) (citations omitted). Mere presence at the scene of the crime, without more, is generally insufficient to prove involvement in the crime, but it will be deemed sufficient if it is intended to aid and does aid the primary actor or actors. Settles v. United States, 522 A.2d 348, 357 (D.C.1987); Creek v. United States, 324 A.2d 688, 689 (D.C.1974); see Gayden v. United States, 584 A.2d 578, 583 (D.C.1990) (traveling with principal to scene of crime, remaining there during its commission, and fleeing with principal are sufficient to prove aiding and abetting), cert. denied, 502 U.S. 843, 112 S.Ct. 137, 116 L.Ed.2d 104 (1991). Stated another way, presence is sufficient "when it is shown that it designedly encourages the perpetrator, facilitates the unlawful deed  as when the accused acts as a lookout  or where it stimulates others to render assistance to the criminal act." Bailey v. United States, 135 U.S.App.D.C. 95, 98-99, 416 F.2d 1110, 1113-1114 (1969) (footnotes omitted). In this case appellant does not deny his presence at the scene of the crime, nor, given the evidence against him, can he reasonably deny that he was involved with the other members of the group in the attack on Mr. Lawson (i.e., in that portion of the attack that preceded the shooting). His argument, rather, is that the crime which he *902 aided and abetted was merely a simple assault, not an assault with intent to commit robbery. We disagree.
Michael Atkins was one of the group of young men who agreed to "get together and beat up a pipehead." Charles Lawson was the unfortunate victim of this agreement. The government's evidence showed that Atkins put his hands into Lawson's pockets at least once, and possibly twice, while Lawson lay unconscious on the ground, and that he removed an object from Lawson's pocket and put it into his own pocket. Although Atkins did not say in so many words that he was acting with a specific intent to rob Mr. Lawson, such an intent can readily be inferred from these acts. See Owens v. United States, supra, 497 A.2d at 1090 ("intent to commit robbery may be inferred not only from the words uttered by the suspect but also from his conduct or from the `totality of the evidence'") (citations omitted). The actor need not expressly declare his intent. Singleton v. United States, 488 A.2d 1365, 1367 (D.C.1985). Thus we hold that the evidence was sufficient to prove that Atkins intended to rob Lawson.
The trial court also found  and the evidence, especially the videotape, supported this finding  that appellant was in close proximity to Atkins ("standing right there looking") while Atkins was rifling Lawson's pockets, and that after these events appellant participated in the process of trying to remove Mr. Lawson from the street. The court perceived this involvement not as a "Good Samaritan" gesture but as part of appellant's contribution to the overall criminal scheme. The fact that appellant himself may not have intended to rob Mr. Lawson is of no legal consequence. "Appellant need not necessarily have intended the particular crime which was committed by the principal in order to be liable for what occurred." Johnson v. United States, 434 A.2d 415, 422 (D.C.1981) (citation omitted); accord, Allen v. United States, 383 A.2d 363, 367 (D.C. 1978) ("no requirement that the aider and abettor have the identical intent of the principal"). We therefore hold that the evidence was sufficient to support the trial court's finding that appellant was guilty of assault with intent to commit robbery.

IV
Appellant makes two additional arguments which we may address more briefly.
First, we reject appellant's contention that the trial court committed reversible error by "instructing itself" that assault with intent to rob is a lesser included offense of robbery. Super.Ct.Juv.R. 31(c) provides in part that a juvenile respondent "may be found guilty of an offense necessarily included in the offense charged. . . ." The applicability of this rule is not dependent on a defense request that a lesser included "instruction" be given; indeed, it could not, for there are no juries  and hence no instructions  in juvenile proceedings.[12] Appellant's argument is a logical absurdity; Rule 31(c) authorizes the court to do exactly what it did.
Second, appellant maintains that the trial court erred in admitting testimony about the first assault on the unknown pedestrian. He contends that such testimony was both irrelevant and highly prejudicial because it constituted "other crimes" evidence, prohibited by Drew v. United States, 118 U.S.App.D.C. 11, 15-16, 331 F.2d 85, 89-90 (1964), and the long line of cases following Drew. This argument is without merit. In the first place, it is well settled that the rules of evidence are not self-executing and that failure "to assert an objection promptly and specifically is a waiver." JOHN W. STRONG, McCORMICK ON EVIDENCE § 55, at 221 (4th ed. 1992) (footnote omitted). Since appellant failed to object to this evidence at trial, he must now demonstrate plain error in order to win reversal on this ground. See Watts v. United States, 362 A.2d 706, 709 (D.C.1976) (en banc) (defining plain error). We find no *903 plain error; indeed, we find no error whatsoever.
In Toliver v. United States, 468 A.2d 958, 960 (D.C.1983), this court held that evidence of uncharged criminal activity that is "intimately entangled with the charged criminal conduct" is not "other crimes" evidence at all. Rather, such evidence is admissible "when relevant to explain the immediate circumstances surrounding the offense charged." Id. (citations omitted). In the case at bar, the assault on the first passer-by occurred after the gang had agreed to attack any would-be drug buyers but before the attack on Mr. Lawson. Since it took place in the very middle of the criminal activity with which appellant was charged, it was plainly admissible under Toliver.

V
To sum up, we hold that appellant's adjudication of delinquency was based solely on the first count of the petition. Although the trial court returned two guilty verdicts, we hold that they merged because, as a matter of law, they applied to two separate parts of the same offense. Thus, to the extent that the judgment is based on a finding that appellant was guilty of simple assault, we vacate that finding as redundant. We further hold that the evidence was sufficient to prove appellant guilty of assault with intent to commit robbery, a lesser included offense of armed robbery as charged in the first count. Because the court returned no verdict on the second count, and because the evidence would not have permitted a guilty verdict on any offense included within that count, we conclude that the second count played no part in the judgment. We reject appellant's other claims of error.
Our final task is to decide what disposition to make of this appeal. If this were a regular criminal case, we would probably remand for resentencing, having concluded that appellant was convicted on only one of two counts. See, e.g., Thorne v. United States, 471 A.2d 247, 249 (D.C.1983). A juvenile case, however, is different. When a juvenile is found guilty of two or more criminal offenses, the court does not "sentence" that juvenile separately on each count as it would sentence an adult. Rather, an adjudication of delinquency is a single, unitary judgment. See D.C.Code § 16-2320(c) (1989); Super.Ct.Juv.R. 32(b). The trial court in this case committed appellant to the custody of the Department of Human Services for a specified period of time, which has recently expired. The record also reveals that appellant is now twenty-one years old, and thus he appears to be no longer subject to the jurisdiction of the juvenile court. See D.C.Code § 16-2303 (1989) (court retains jurisdiction over a delinquent child until the child's twenty-first birthday, unless terminated sooner). In these circumstances, having vacated the finding that appellant was guilty of simple assault, we shall simply affirm the unvacated portion of the trial court's judgment.
Affirmed in part, vacated in part.
NOTES
[1] D.C.Code § 22-504 (1989). To avoid confusion, we shall refer hereafter to this offense by its colloquial name of "simple" assault.
[2] D.C.Code § 22-501 (1989).
[3] Appellant's argument is based on Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). We need not consider it because we reach the same conclusion by another route.
[4] According to Bryant, the term "pipehead" refers to a person interested in purchasing drugs.
[5] Bryant testified that appellant "ran in the house or went around to the side of the house."
[6] Lawson's companion, however, managed to flee without being attacked. He was never identified.
[7] Bryant's testimony on this point is not very clear. It appears from what he said that only one person, whom Bryant never named, urinated on Mr. Lawson. Appellant later testified, however, that two persons had urinated on Lawson, and he identified them as Kirky and Quentin.
[8] Bryant testified on redirect examination, "As soon as Michael Atkins bent down and started [to] check the man's pockets, that's when Grumpy turned around and left to go in the house."
[9] Bryant said that Atkins rummaged through Mr. Lawson's pockets twice, and that appellant had come back out of the house and was standing on the porch when Atkins went through Lawson's pockets the second time.
[10] On cross-examination appellant admitted that he was unsure about the exact sequence of these events, and that it was possible that Atkins searched Lawson's jacket before Kirky and Quentin urinated on him.
[11] Appellant moved for a judgment of acquittal on the charge of robbery, arguing that the government had failed to prove that anything of value was taken from Mr. Lawson. Although the court denied the motion, its subsequent verdict accomplished the same result. Thus appellant's present argument that the court erred in denying the motion is moot.
[12] For this reason Jones v. United States, 620 A.2d 249 (D.C.1993), on which appellant relies, is inapposite. Jones does not hold, in any event, that only the defendant may request a lesser included offense instruction; rather, it stands for the proposition that the defendant has a right to choose between two alternative instructions when the jury reports a deadlock. Jones has no bearing on this case.