**Irene WAGNER and Francis Wagner, Appellants/Cross–Appellees,**

v.

**GEORGETOWN UNIVERSITY MEDICAL CENTER, Appellee,**

and

**Arthur I. Kobrine, M.D., Appellee/Cross– Appellant.**

**Nos. 96–CV–1388, 96–CV–1688, 96–CV–1980, 97–CV–1205.**

District of Columbia Court of Appeals.

Argued Jan. 4, 2000.
Decided March 8, 2001.

---

Christian Camenisch, for appellants/cross-appellees Irene Wagner and Francis Wagner.

William R. Murray, Jr., Washington, DC, for appellee Georgetown University Medical Center.

Brian J. Nash, with whom Stuart N. Herschfeld, Annapolis, MD, and Leonard Dooren were on the briefs, for appellee/cross-appellant Arthur I. Kobrine, M.D.

Before STEADMAN, FARRELL and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

Irene Wagner awoke from back surgery performed at Georgetown University Medical Center to find herself permanently paralyzed from the waist down. Mrs. Wagner and her husband Francis Wagner sued Georgetown and Arthur I. Kobrine, M.D., the primary operating surgeon, for malpractice.[1] After protracted pretrial proceedings and a three-week trial, a jury returned a defense verdict on all counts.

The Wagners have appealed, raising four claims of error. First, the Wagners challenge the trial court's ruling that their cause of action for negligent failure to obtain Mrs. Wagner's informed consent to her surgery, which the Wagners first raised in an amended complaint, was barred by the statute of limitations. The Wagners argue that the court erred in concluding that the informed consent count did not relate back to the date of the Wagners' original complaint, which alleged negligence in the performance of her surgery. Second, the Wagners contend that the trial court abused its discretion in permitting their expert witness to be impeached with the fact that a professional association had censured him for testifying "unethically." Third, the Wagners charge that the trial court abused its discretion in allowing a second defense expert called by Dr. Kobrine to testify on the issue of proximate causation, despite a claim by the Wagners of unfair surprise. Fourth, the Wagners urge that the trial court abused its discretion by refusing to allow them to present testimony to rebut the defense expert on the causation issue.

Although he prevailed at trial, Dr. Kobrine has cross-appealed. He claims that the trial court erred in failing to grant him judgment as a matter of law on the ground that no jury could reasonably have found for the Wagners on their claim that he negligently performed the surgery on Mrs. Wagner.

We hold that under Super. Ct. Civ. R. 15(c)(2), a subsequently pled claim of lack of informed consent to surgery may relate back to an original complaint that pleads a claim of negligence in the performance of that surgery. As to Georgetown, we therefore conclude that the Wagners' informed consent claim was not barred by the statute of limitations. We reach the opposite conclusion as to Dr. Kobrine, however, because the Wagners dismissed their original complaint against him before they renamed him in their amended complaint. In Dr. Kobrine's case there was, therefore, no complaint to which the newly pled informed consent claim could relate back.

We conclude that the other claims of error raised by the Wagners on appeal do not entitle them to relief. We hold that the trial court did not abuse its discretion in permitting the impeachment of the Wagners' expert witness. We further hold that if there was error in the remaining rulings at issue, which we do not decide, the error was harmless in light of the special verdict that the jury rendered. We therefore affirm the jury's verdict in favor of Dr. Kobrine and Georgetown, and remand solely for further proceedings as to Georgetown with respect to the Wagners' informed consent claim. In light of that disposition, we hold that Dr. Kobrine's challenge to the trial court's denial of judgment in his favor as a matter of law is moot.

I.

A. **Factual Background**

The surgical operation that gave rise to this case took place on October 3, 1990. Mrs. Wagner was then 65 years old. For a period of some two years Mrs. Wagner had been experiencing worsening pain and weakness in her lower back and legs. In July 1990, after having been treated by other health care providers without success, Mrs. Wagner consulted Dr. Kobrine,

---

1. Mr. Wagner's claim was for loss of consortium.

a neurosurgeon, and Sam W. Wiesel, M.D., the Chairman of the Department of Orthopaedic Surgery at Georgetown. Diagnosing the cause of Mrs. Wagner's pain as spinal stenosis with degenerative scoliosis,[2] Dr. Kobrine and Dr. Wiesel proposed surgery. The surgery would consist of a decompressive laminectomy and a foraminotomy[3] to be performed by the neurosurgeon, Dr. Kobrine, and a fusion of the lumbar spine to be performed by the orthopedist, Dr. Wiesel.

When Dr. Wiesel told Mrs. Wagner that the proposed procedure had a success rate of between 50 and 60 percent and could result in serious complications, including paralysis, infection and death, she was initially reluctant to go forward with surgery. According to Mrs. Wagner, Dr. Kobrine assuaged her anxiety, telling her not to worry because "everything will be okay." Mrs. Wagner elected to proceed with the operation.

On October 2, 1990, Mrs. Wagner was admitted to Georgetown. The surgery took place the next day. Dr. Wiesel and his orthopedic team began and closed the procedure, while Dr. Kobrine performed the neurosurgical portion. When Mrs. Wagner awoke from the surgery, she was paralyzed from the waist down. She was returned to surgery immediately, and efforts were made to determine the cause and allay her condition. No hematoma or other cause was found, and Mrs. Wagner has remained paraplegic since the surgery.

## B. Overview of the Lawsuit

The Wagners filed their initial malpractice complaint, naming Dr. Kobrine, Dr. Wiesel, Georgetown, and an anesthesiologist, in 1993. Dr. Wiesel and the anesthesiologist were subsequently dismissed by stipulation, because they were full time employees of Georgetown who were covered by its self insurance trust. The lawsuit proceeded against Dr. Kobrine (who was not an employee of Georgetown) and Georgetown itself. In August 1996, after three-and-a-half years of complicated and sometimes tortuous pretrial proceedings (which we describe, to the extent they are relevant, in our discussion below of the issues raised on appeal), the case came on for trial.

Following a pretrial ruling (discussed in detail below) that precluded the Wagners from pursuing their claim that Dr. Kobrine and Dr. Wiesel were negligent in operating on Mrs. Wagner without her informed consent, the Wagners proceeded to trial on theories of misdiagnosis, unnecessary surgery, and (against Dr. Kobrine only) surgical negligence. Specifically, the Wagners contended that Dr. Kobrine and Dr. Wiesel misdiagnosed the cause of Mrs. Wagner's back pain when they attributed it to stenosis, and that they recommended and went ahead with surgery that was inappropriate and not warranted by the results of diagnostic tests. In addition, the Wagners contended that Dr. Kobrine performed the surgery negligently by using an unduly large surgical instrument during the foraminotomy phase, impinging on a key artery as a result and causing an occlusion of the blood supply to Mrs. Wagner's spinal cord.

At the close of the plaintiffs' case, Dr. Kobrine and Georgetown moved for directed verdicts (i.e., for judgment as a matter of law pursuant to Super. Ct. Civ. R. 50(a)). The court took the motions under advisement. At the close of all the evidence, the defendants renewed their motions. The court in effect granted the

**2.** Spinal stenosis signified a constriction of the spinal canal resulting in compression of a nerve or nerves. Scoliosis is a curvature of the spine.

**3.** A laminectomy involves the removal of vertebral laminae, or plates. A foraminotomy is "a surgical operation for the enlargement of an intervertebral foramen (a normal opening between two vertebrae of the spine). It is done to relieve pressure on the root of a spinal nerve, a nerve passing through an intervertebral foramen." J.E. SCHMIDT, ATTORNEYS' DICTIONARY OF MEDICINE AND WORD FINDER F–100 (Matthew Bender ed., 1992).

motions with regard to the misdiagnosis claim,[4] denied or took the other motions under advisement, and submitted the case to the jury on the unnecessary surgery and surgical negligence claims. After four days of deliberations, the jury returned a verdict in favor of the defendants. Thereafter, the Wagners moved for a new trial, while Dr. Kobrine moved for a judgment "notwithstanding the verdict" (i.e., renewing his request for judgment as a matter of law, pursuant to Super. Ct. Civ. R. 50(b)). After extended argument, the trial court denied both post-trial motions. These appeals followed.

## II.

### A. Preclusion of the Informed Consent Claim

#### 1. Procedural Background

The issue of whether the Wagners would be permitted to assert their claim that Drs. Kobrine and Wiesel were negligent in performing surgery on Mrs. Wagner without obtaining her informed consent has a complicated but pertinent procedural history. The Wagners filed their original complaint on March 23, 1993, within the three-year limitations period for claims of negligence. *See* D.C.Code § 12–310(8) (1995). That complaint alleged that the defendants were negligent "in their care and treatment of" Mrs. Wagner, "specifically including but not limited to" four particular acts of negligence during the performance of the surgery[5] and the negligent selection and supervision of the anesthesiologist who participated in the surgery. Additionally, the complaint alleged, "defendants were otherwise negligent." The original complaint did not specifically allege negligent failure to obtain Mrs. Wagner's informed consent to the surgery.

On August 13, 1993, after the Wagners had deposed Dr. Kobrine, their then-counsel sent a letter to Dr. Kobrine's counsel offering to dismiss him from the lawsuit without prejudice, on condition, *inter alia*, that he "agree not to raise a statute of limitations defense if I have to bring him back in as a result of something that might surface in discovery, e.g., one of Georgetown's experts blames the whole thing on Dr. Kobrine." This overture led to the preparation of a stipulation among the Wagners, Dr. Kobrine and Georgetown, dismissing Dr. Kobrine without prejudice. In the stipulation, which was filed September 1, 1993, Dr. Kobrine agreed that "should it be necessary for Plaintiffs to file an Amended Complaint naming Dr. Kobrine as a defendant, Dr. Kobrine will not assert any legal defenses that were not available to him at the time of the filing of the original Complaint, including the defense of the statute of limitations." (In contrast to the language of the letter, the stipulation did not state that Dr. Kobrine agreed to waive the statute of limitations only if he was brought back into the lawsuit as a result of new information surfacing in discovery.)

For its part, Georgetown agreed to the dismissal of Dr. Kobrine, *see* Super. Ct. Civ. R. 41(a)(ii), on the understanding, confirmed in an August 17, 1993, letter to the Wagners' counsel, that the Wagners "do not intend to pursue a lack of informed consent claim against Georgetown." Georgetown sought this assurance so that it would not find itself in the "distasteful" position after Dr. Kobrine's dismissal of having either to defend an informed consent case on its own, or to file a third-party complaint against Dr. Kobrine ("a fellow physician"). The stipulation itself

4. The Wagners do not challenge this ruling on appeal.

5. The four acts of negligence cited in the complaint were the defendants' alleged failures during surgery to monitor Mrs. Wagner's vital signs, to control her bleeding, to replenish her lost blood volume, and to maintain her blood pressure. The Wagners' theory at the time was that a blood clot in Mrs. Wagner's vascular system on the course back to the heart resulted in the death of her spinal cord tissue. By the time of trial the Wagners had abandoned this theory.

does not refer to this side agreement between Georgetown and the Wagners.

On January 4, 1994, a few months after Dr. Kobrine's dismissal by stipulation and more than three years after Mrs. Wagner's surgery, the Wagners moved pursuant to Super. Ct. Civ. R. 15(a) for leave to file an amended complaint renaming Dr. Kobrine as a defendant and specifically alleging additional acts of negligence. The Wagners' motion stated that they had determined during discovery that Mrs. Wagner's surgery "was unnecessary surgery and should not have been performed" in view of the results of pre-operative diagnostic tests. The proposed amended complaint alleged three additional acts of negligence on the part of Dr. Kobrine and Georgetown in their care and treatment of Mrs. Wagner: (i) that they misdiagnosed her underlying medical condition, (ii) that they performed unnecessary and inappropriate surgery, and (iii) that they failed to obtain Mrs. Wagner's informed consent to the surgery, "including the failure to accurately inform [her] of the anticipated results of the surgery and the alternatives thereto." As the informed consent claim was elaborated in the subsequent joint pretrial statement, the Wagners contended that Dr. Kobrine and Dr. Wiesel overstated the probability that surgery would alleviate Mrs. Wagner's back pain and failed to disclose that the surgery was not indicated by diagnostic testing; and, further, that Dr. Kobrine secured Mrs. Wagner's consent "only by assuring her that there would be no complications arising from [the surgical] procedure [and] that the proposed surgical procedure would alleviate her pain."

Dr. Kobrine and Georgetown opposed the motion for leave to file the amended complaint on the ground that the new allegations of negligence were barred by the three-year statute of limitations and did not "relate back" to the date of the original complaint under Super. Ct. Civ. R. 15(c). In particular, they argued that the informed consent count did not arise out of the "conduct, transaction or occurrence" set forth in the original complaint, as required by Rule 15(c)(2), because it concerned pre-surgery communications and events rather than the surgery itself. Dr. Kobrine further contended that he did not waive the statute of limitations as to the new claims in the stipulation of dismissal, and that those claims were barred for the additional reason that they were not based on new information generated following his dismissal. Georgetown urged that leave to amend to add the informed consent count should also be denied, even if the new claims were not time-barred, because the Wagners had earlier represented that they would not pursue an informed consent claim against Georgetown. According to Georgetown, allowing the amended complaint would mean "robbing Georgetown" of the consideration that the Wagners provided to induce Georgetown to assent to the dismissal of Dr. Kobrine—at least if Dr. Kobrine was not reinstated as a defendant himself.

On January 27, 1994, Judge Kaye K. Christian granted the Wagners' motion for leave to amend over the defendants' objections and ordered that the amended complaint be received for filing. Judge Christian's order did not address the objections raised by Dr. Kobrine and Georgetown specifically. The order stated only that discovery was still in process and "there appears to be no prejudice to defendants."

Following the close of discovery, on November 7, 1994, Dr. Kobrine moved for summary judgment with respect to all of the Wagners' claims of negligence except the claim based on lack of informed consent. As to that claim, Dr. Kobrine conceded that it was "supported by expert medical testimony" and that a genuine factual dispute existed "based upon the deposition testimony of the parties and other witnesses." On November 8, 1994, Georgetown filed its motion for summary judgment. Unlike Dr. Kobrine, Georgetown did seek summary judgment on the informed consent claim. Citing its earlier

opposition to the motion for leave to file the amended complaint, Georgetown reiterated without elaboration its contentions that the informed consent claim was time-barred and that the Wagners had "waived" the claim. In addition, Georgetown argued that Drs. Kobrine and Wiesel did obtain Mrs. Wagner's informed consent before proceeding with surgery, and that, in any event, Mrs. Wagner had not relied on anything Dr. Wiesel said to her in deciding to undergo the operation.

On March 31, 1995, Judge Curtis E. von Kann denied Dr. Kobrine's and Georgetown's motions for summary judgment. Judge von Kann's order did not discuss specifically any of the points raised by the motions.

■ Three months later, on June 28, 1995, Georgetown filed a motion in limine to preclude the Wagners from asserting their informed consent claim against Georgetown. In that motion, Georgetown resurrected its contentions that the claim was barred by the statute of limitations and did not relate back to the date of the original complaint, and that the Wagners had waived the claim by representing that they would not pursue it. Dr. Kobrine followed suit with a similar motion, in which he renewed the arguments that he had made in opposing the filing of the amended complaint. The Wagners opposed the motions in limine, arguing *inter alia* that the informed consent claim related back to the claim of negligence asserted in the original complaint. They also argued that Dr. Kobrine waived his right to assert the statute of limitations against the informed consent claim when he entered into the stipulation of dismissal. Alterna-

tively, the Wagners contended that under the so-called "discovery rule," the informed consent claim was still timely because the statute of limitations did not start to run until they acquired requisite evidence of wrongdoing in the course of discovery.[6]

The motions in limine were argued before Judge Michael Rankin on January 4, 1996. Persuaded that the earlier rulings of Judge Christian and Judge von Kann had not settled the issue, Judge Rankin concluded that the informed consent claim did not arise out of "the conduct, transaction or occurrence set forth or attempted to be set forth" in the original complaint, which Judge Rankin deemed to be the actual performance of the surgery on Mrs. Wagner. The focus of informed consent is different, Judge Rankin reasoned:

> The question of informed consent goes to whether there would have been an operation at all. When a person prevails on a claim of lack of informed consent, they prevail because they show that they didn't have sufficient information on which to make a reasonable judgment and people who . were in a position to give them the information failed to honor the duty to give them the information.

In other words, because an informed consent claim focuses on what the doctor told the patient prior to the surgery, and not on what the doctor did during the surgery, Judge Rankin ruled that the claim did not relate back to the original complaint under Rule 15(c)(2).[7]

With respect to the other issues before him, Judge Rankin was not persuaded by

---

6. "[F]or a cause of action to accrue where the discovery rule is applicable, one must know or by the exercise of reasonable diligence should know (1) of the injury, (2) its cause in fact, and (3) of some evidence of wrongdoing." *Bussineau v. President & Dir. of Georgetown College*, 518 A.2d 423, 435 (D.C.1986). Inquiry notice of the possible cause of action will suffice to start the running of the clock. *See Colbert v. Georgetown Univ.*, 641 A.2d 469, 473 (D.C.1994) (en banc).

7. Judge Rankin did not address the Wagners' misdiagnosis and inappropriate surgery claims, which the Wagners were not precluded from pursuing at trial. We note, however, that like the informed consent claim, those claims focus on pre-operative matters, namely the medical testing and diagnosis that preceded the decision to undertake surgery, rather than on the performance of the surgery itself.

Georgetown's alternative contention that the Wagners waived their informed consent claim against Georgetown when their counsel said that they did not intend to pursue that claim in exchange for Georgetown's acquiescence in the dismissal of Dr. Kobrine. It appears that Judge Rankin found that the agreement between counsel was not sufficiently specific to constitute a waiver of the claim, and that in any event the claim was not waived against Georgetown so long as Dr. Kobrine was brought back into the case.

On the other hand, Judge Rankin agreed with Dr. Kobrine that he did not waive the right to assert the statute of limitations against the informed consent claim when he entered into the September 1, 1993, stipulation dismissing him from the lawsuit. Based on the August 13, 1993, letter in which the Wagners' counsel first broached the subject of Dr. Kobrine's dismissal, Judge Rankin found that Dr. Kobrine agreed to waive the statute of limitations only as to claims that might surface in subsequent discovery. Concluding that the Wagners knew or should have known of the factual basis of their informed consent claim *before* they dismissed Dr. Kobrine, Judge Rankin ruled that Dr. Kobrine was not estopped by his stipulation from contending that it was time-barred.

Finally, Judge Rankin rejected the Wagners' reliance on the discovery rule, concluding that the Wagners were on inquiry notice from the date of injury of the potential informed consent claim.

Having so ruled, Judge Rankin granted the motions in limine and prohibited the Wagners from asserting lack of informed consent at trial.

## 2. Analysis

 On appeal, the Wagners challenge Judge Rankin's ruling that the informed consent claim did not relate back to the original complaint and was, therefore, barred by the statute of limitations. The Wagners have abandoned their arguments that the claim was timely under the discovery rule and that Dr. Kobrine waived his right to raise the statute of limitations as a defense.[8] Georgetown asks us to affirm Judge Rankin's ruling on relation back, and also argues that a lack of sufficient credible evidence to support an informed consent claim against it constitutes an independent ground on which to uphold the preclusion of that claim. Georgetown has not, however, pursued in this court its argument that the Wagners waived their informed consent claim.[9] Dr. Kobrine also argues that we should affirm the ruling on relation back. As an alternative basis on which to uphold the trial court's ruling, Dr. Kobrine argues that because the original complaint was dismissed against him, the informed consent claim in the amended complaint cannot relate back to it and was for that reason properly held to be time-barred as to him.

---

8. This court will normally decline to consider contentions raised for the first time in oral argument, at least absent compelling reasons not apparent here. *See Woodard v. United States*, 738 A.2d 254, 259 n. 10 (D.C.1999).

9. The bare mention of this claim in a footnote in Georgetown's brief as "another independent basis for precluding an informed consent claim against Georgetown" does not suffice to preserve the argument for our consideration. *See Bardoff v. United States*, 628 A.2d 86, 90 n. 8 (D.C.1993) (questions raised but not argued in briefing are treated as abandoned) (citing *Cratty v. United States*, 82 U.S.App. D.C. 236, 243, 163 F.2d 844, 851 (1947)). In the words of one court:

[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.... It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.... "Judges are not expected to be mindreaders. Consequently, a litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace."

*United States v. Zannino*, 895 F.2d 1, 16 (1st Cir.1990) (citations omitted).

### a. Relation Back

Rule 15(c)(2) of the Superior Court Rules of Civil Procedure provides that an amendment of a pleading "relates back" to the date of the original pleading for statute of limitations purposes when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." The original pleading in this case, the complaint of March 23, 1993, alleged negligence in the care and treatment of Mrs. Wagner, "including but not limited to" negligence in the execution of particular aspects of her surgery and the selection and supervision of the anesthesiologist who participated in that surgery. The amended complaint added the allegation that Dr. Kobrine and Georgetown were negligent in performing Mrs. Wagner's surgery without her informed consent. Thus both the original and the amended complaint sought to recover damages for injuries resulting from Mrs. Wagner's surgery because her physicians were negligent, either in performing that surgery (original complaint) or in obtaining her consent to perform it (amended complaint). Does the new claim in the amended complaint therefore arise out of the same "conduct, transaction or occurrence set forth or attempted to be set forth" in the original complaint for purposes of Rule 15(c)(2)? This is a question of law, subject to our de novo review. For the reasons that follow, we answer it in the affirmative.

No prior decision of this court has addressed whether a claim of lack of informed consent to medical treatment relates back to a claim of negligence in the provision of that treatment. Other courts have split rather evenly on that question. For example, in *Jolly v. Russell,* 203 A.D.2d 527, 611 N.Y.S.2d 232, 233 (1994), the court (one judge dissenting) held that there was no relation back under the New York analog of Rule 15(c)(2). The majority reasoned that because "lack of informed consent is a distinct cause of action requiring proof of facts not contemplated by an action based merely on allegations of negligence," the allegations of general medical negligence in the original pleading "did not provide notice of the series of transactions or occurrences to be proved in a cause of action based on lack of informed consent." *Id.* at 233. *Accord, Bigay v. Garvey,* 575 N.W.2d 107, 110 (Minn.1998); *Keenan v. Yale New Haven Hospital,* 167 Conn. 284, 355 A.2d 253, 254 (1974).[10] In contrast, the court in *Neeriemer v. Superior Court of Maricopa County,* 13 Ariz.App. 460, 477 P.2d 746 (1970), held that an informed consent claim would relate back under the Arizona counterpart of Rule 15(c)(2) to a claim of negligence in the performance of surgery. The court rejected the argument that the informed consent claim could not relate back because it required proof of additional acts not encompassed in the original claim:

> This argument, in our opinion, takes too narrow a view of Rule 15(c). Logically applied, it would prohibit relation back even where the plaintiff alleged an additional specific act of negligence during the operation itself, unless the newly alleged act was related to the previously alleged specific acts. But the *general* fact situation involving petitioner's claim against the respondent doctors did not spring into existence at the moment that petitioner was allegedly sutured improperly. Suturing was but one incident or part of a broader focal event—the surgical operation. Petitioner emphasizes the term "transaction" and the entire physician-patient relationship, but in our view, the most reasonable reading of Rule 15(c) makes the operation the critical " * * * occurrence * * * set forth in the original pleading."

---

10. *See also Moore v. Baker,* 989 F.2d 1129, 1132 (11th Cir.1993). In that case, the court confronted the reverse question, and held that a claim of negligence during surgery and post-operative care did not relate back to an earlier lack of informed consent claim.

*Id.* at 749. Considering the operation to be the "occurrence" set forth in the original pleading, the court found it more significant for purposes of relation back that the plaintiff "was not substantially wronged in the sense of his amended claim until he actually underwent the operation to which he now alleges he did not intelligently consent. In other words, the term 'lack of informed consent' demands an object, or predicate: consent to what? The operation itself is an indispensable element of the wrong." *Id.* at 750. *Accord, Wall v. Brim,* 145 F.2d 492, 493 (5th Cir.1944); *Wagner v. Olmedo,* 323 A.2d 603, 604–05 (Del.Super.Ct.1974); *Brown v. Wood,* 202 So.2d 125, 128–30 (Fla.App.1967).[11]

Although the question before us is an open one on which other courts have divided, the principles that guide our resolution of the question are settled. Relation back is designed to foster the resolution of disputes on their merits rather than on the basis of pleading technicalities, to the extent that resolution on the merits is consistent with the policies underlying statutes of limitations. Accordingly, in *Hartford Accident & Indemnity Co. v. District of Columbia,* 441 A.2d 969 (D.C. 1982), this court held that under Rule 15(c)(2) an "amended complaint relates back where 'the initial complaint put the defendant on notice that a certain range of matters was in controversy and the amended complaint falls within that range.'" *Id.* at 972 (quoting *Jackson v. Airways Parking Co.,* 297 F.Supp. 1366, 1382 (N.D.Ga.1969)). Cases construing the identical federal rule from which our Rule 15(c)(2) derives,[12] *see* Fed.R.Civ.P. 15(c)(2), confirm that the central inquiry is "to determine whether the adverse party, viewed as a reasonably prudent person, ought to have been able to anticipate or should have expected that the character of the originally pleaded claim might be altered or that other aspects of the conduct, transaction, or occurrence set forth in the original pleading might be called into question." 6A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1497, at 93 (2d ed.1990). The rationale of the relation back rule is that "the filing of a suit ... warns the defendant to collect and preserve his evidence in reference to it.... [T]he defendant knows that the whole transaction described in it will be fully sifted, by amendment if need be, and that the form of the action or the relief prayed or the law relied on will not be confined to their first statement." *Barthel v. Stamm,* 145 F.2d 487, 491 (5th Cir.1944). Thus, "[t]he fact that an amendment changes the legal theory on which the action initially was brought is of no consequence if the factual situation upon which the action depends remains the same and has been brought to defendant's attention by the original pleading." WRIGHT ET AL., § 1497, at 95. "It is not unreasonable to require [the defendant] to anticipate all theories of recovery [for the damages claimed in a complaint] and prepare its defense accordingly." *Zagurski v. American Tobacco Co.,* 44 F.R.D. 440, 443 (D.Conn.1967) (where original complaint sought damages from smoking cigarettes based on theories of negligent manufacture

---

**11.** *See also Azarbal v. Medical Center of Delaware, Inc.,* 724 F.Supp. 279, 282 (D.Del. 1989); *Jefferson v. Eboh,* No. 9–95–58, 1996 WL 355037, *2–*3, 1996 Ohio App. LEXIS 2840, *4–*7 (Ohio Ct.App.1996); and *Mayor v. Dowsett,* 240 Or. 196, 400 P.2d 234, 250–52 (1965). These three cases lend additional support to the relation back of an informed consent claim, even though they are arguably distinguishable.

**12.** This court has said that because Rule 15(c) is "'an adoption without modification of the corresponding federal rule,'" it is to be "'given the same meaning.'" *Arrington v. District of Columbia,* 673 A.2d 674, 680 n. 6 (D.C. 1996) (quoting *Strother v. District of Columbia,* 372 A.2d 1291, 1297 n. 15 (D.C.1977)). While decisions of the lower federal courts construing the federal rule may not bind us in our interpretation of our Rule 15(c), such decisions are therefore instructive. *See Varela v. Hi–Lo Powered Stirrups, Inc.,* 424 A.2d 61, 68–9 (D.C.1980).

and implied warranties of fitness for personal use, amended complaint charging negligent failure to warn the plaintiff of the dangers of smoking *held* to relate back).[13]

■ In light of these principles, we conclude that the requirements of Rule 15(c)(2) were met by the informed consent allegation in the Wagners' amended complaint. At a minimum, the original complaint notified Dr. Kobrine and Georgetown that the Wagners sought to recover damages for injuries resulting from the surgery that they had performed on Mrs. Wagner. The "occurrence" set forth in that complaint was the surgery; the legal theory justifying recovery of damages was that the defendants had performed that surgery in a negligent manner.[14] The amended complaint merely added another legal theory, that the defendants had performed that surgery without Mrs. Wagner's informed consent to accept the risk of surgery which proximately caused her injuries. *See Lasley v. Georgetown Univ.*, 688 A.2d 1381, 1384 (D.C.1997); *Jones v. Howard Univ., Inc.*, 589 A.2d 419, 422 (D.C.1991). Although that theory was new, it was still a theory for recovering the same damages for the same injuries attributable to the same event. The informed consent claim in the amended complaint still arose, therefore, out of the same occurrence-the surgery-as was set forth in the original complaint. As "reasonably prudent" defendants, Dr. Kobrine and Georgetown ought to have expected that

other aspects of that surgery "might be called into question"; that the circumstances of the surgery would be "fully sifted"; that they would have to "anticipate all theories of recovery" for the injuries caused by the surgery; and that they would therefore need to "collect and preserve" their evidence and prepare to defend against any such theories. For the amended claim to relate back, Rule 15(c)(2) requires nothing more.

For these reasons, we do not think it fatal to relation back that, as Dr. Kobrine and Georgetown argue, "informed consent claims concern a duty of the physician 'which is completely separate and distinct from his responsibility to skillfully diagnose and treat the patient's ills.'" Cleary v. Group Health Ass'n, 691 A.2d 148, 155 (D.C.1997) (quoting *Wilkinson v. Vesey*, 110 R.I. 606, 295 A.2d 676, 685 (1972)).[15] Nor can Dr. Kobrine and Georgetown legitimately claim surprise because the informed consent claim focuses on events occurring prior to rather than during the surgery itself. Any competent lawyer defending a physician accused of performing surgery in a negligent manner would investigate not only the narrow issue of how the surgery was conducted, but also the facts and circumstances surrounding the surgery, including the events leading up to it. Whether or not an informed consent claim had been asserted, communications between physician and patient prior to the surgery would be a prime subject of inquiry. Defense counsel would need to learn

13. Similarly, in the leading case of *Tiller v. Atlantic Coast Line Railroad Co.*, 323 U.S. 574, 581, 65 S.Ct. 421, 89 L.Ed. 465 (1945), the Supreme Court held that despite a change in legal theory from failure to keep a proper lookout to failure to provide requisite lighting, a new claim related back to the original complaint; for "respondent has had notice from the beginning that petitioner was trying to enforce a claim against it because of the events leading up to the death of the deceased in respondent's yard."

14. We do not rely on the fact that, in addition to containing specific allegations of negligence in the performance of surgery on Mrs.

Wagner, the original complaint included a general allegation of unspecified negligence in her care and treatment.

15. In discussing the duty of the physician to obtain a patient's informed consent to treatment, this court has said that, "at a minimum, a physician must disclose the nature of the condition, the nature of the proposed treatment, any alternate treatment procedures, and the nature and degree of risks and benefits inherent in undergoing and in abstaining from the proposed treatment." *Crain v. Allison*, 443 A.2d 558, 562 (D.C. 1982).

what the physician said in obtaining the patient's consent to the surgery, because counsel would need to know, for example, whether the physician said anything—e.g., about the condition of the patient, the surgery to be performed, or the risks involved—that could be evidence of negligence on the physician's part. Thus, even if the original complaint in this case did not mention lack of informed consent specifically, that complaint was nonetheless calculated to cause counsel for Dr. Kobrine and Georgetown to focus on the facts that would underlie such a claim as a routine part of defense preparation. To say that is to say that Dr. Kobrine and Georgetown could not claim surprise when the Wagners eventually advanced an informed consent claim based on those facts.

There is corroboration in the record that the Wagners' original complaint sufficed to require the defendants to anticipate a potential informed consent claim. Georgetown argues that it had no notice of a possible informed consent claim until after the running of the statute of limitations because counsel for the Wagners represented that they did not intend to make such a claim when they asked Georgetown to agree to the stipulation dismissing Dr. Kobrine. But the fact that Georgetown inquired about an informed consent claim demonstrates that Georgetown actually did anticipate that the claims in the original complaint might be broadened to include lack of informed consent. Although that fact is not the basis for our conclusion that the Wagners' original complaint put Dr. Kobrine and Georgetown on notice that an informed consent claim might be added, it confirms the soundness of that conclusion.

Nor have Dr. Kobrine and Georgetown made a credible claim of unfair prejudice from the "late" assertion of a claim of lack of informed consent. At the hearing on the motion in limine, Judge Rankin asked

Georgetown's counsel, "how are you hurt by the amended complaint bringing in this claim [i.e., informed consent] since the amended complaint also brought your co-defendant back in the case?" Counsel responded that "we're not hurt in respect of Dr. Kobrine being brought back into the case. It is true that now we are in the situation where we're defending the case and Dr. Kobrine is defending the informed consent claim and we both can present the evidence on those issues." Judge Rankin then asked if it was true that "you're not in a worse position than you would have been if they [the Wagners] had phoned it in initially [i.e., asserted lack of informed consent in the initial complaint against both defendants]." Counsel responded, "That's true."

We therefore conclude, contrary to the trial court, that an amended complaint adding a claim of lack of informed consent to surgery relates back under Rule 15(c)(2) to an earlier complaint alleging negligence in the performance of that surgery.[16] Since the original complaint against Georgetown was filed within the three year period prescribed by the applicable statute of limitations, we conclude that the Wagners' informed consent claim against Georgetown was not time-barred. We do not, however, reach the same conclusion as to Dr. Kobrine. As we now explain, because the original complaint against Dr. Kobrine was dismissed, the amended complaint cannot relate back to it.

### b. Dismissal of the Original Complaint

▋ When the Wagners voluntarily dismissed their original complaint against Dr. Kobrine without prejudice, the running of the statute of limitations on their claims was not tolled. *See Sayyad v. Fawzi*, 674 A.2d 905, 906 (D.C.1996); *York & York Constr. Co. v. Alexander*, 296 A.2d 710, 712

---

**16.** Our holding does not depend on whether the lack of consent claim sounds in negligence or battery, although a different limitations period is applicable depending on which

theory of liability is advanced. *See Tavakoli–Nouri v. Gunther*, 745 A.2d 939, 942 (D.C. 2000).

(D.C.1972). To preserve the Wagners' ability to rename Dr. Kobrine as a defendant after the statute had run, the stipulation of dismissal therefore had to provide expressly that he would not assert the statute as a defense to a new complaint against him. The trial court found, however, that the stipulation did not prevent Dr. Kobrine from invoking the statute as to the Wagners' informed consent claim, because that claim was not brought on the basis of newly discovered evidence. The Wagners have abandoned any challenge to that ruling, which in any event we do not find to be either "clearly wrong or without evidence to support it." D.C.Code § 17–305(a) (1997).

The three-year statute of limitations had run by the time the Wagners first asserted their informed consent claim against Dr. Kobrine. The original complaint against him having been dismissed, there was no earlier pleading extant to which the claim could relate back under Rule 15(c)(2). While the order of Judge Christian granted the Wagners leave to file their amended complaint against Dr. Kobrine, it did not reinstate, *nunc pro tunc* to its filing date, the original complaint that the Wagners had filed against him.[17] We therefore affirm Judge Rankin's decision to grant Dr. Kobrine's motion in limine.

### c. Insufficiency of the Evidence

Georgetown argues that even if the informed consent claim did relate back to the original complaint against it, we should affirm Judge Rankin's decision to grant its motion in limine because independent grounds preclude the Wagners from pursuing the claim against Georgetown. Specifically, Georgetown argues that no reasonable jury could find that Dr. Wiesel failed to disclose accurately the probability of success of the surgical procedure he

proposed. Additionally, Georgetown argues that Mrs. Wagner did not rely on Dr. Wiesel's statements in deciding to proceed with surgery, and that those statements therefore could not have been the proximate cause of her injuries. In asking us to uphold Judge Rankin's ruling on these grounds, Georgetown invokes the principle that "if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason." *Helvering v. Gowran,* 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224 (1937); *see also Marinopoliski v. Irish,* 445 A.2d 339, 340 (D.C.1982).

■ Judge von Kann rejected Georgetown's arguments about the inadequacy of the evidence, and found that only a jury could resolve the merits of the Wagners' informed consent claim, when he denied Georgetown's motion for summary judgment. Georgetown is, in effect, asking us to review that denial in light of the entire record, including the testimony and other evidence adduced at trial. The denial of a motion for summary judgment is usually not reviewable on appeal, as it is not a final judgment. Even on appeal from a final judgment after trial, the correctness of a pretrial denial of summary judgment is ordinarily not subject to review, because that denial is superseded by the trial of the case on the merits. *See Morgan v. American Univ.,* 534 A.2d 323, 326–29 (D.C. 1987).

■ In this case, however, a trial on the merits did not moot the issue of the viability of the Wagners' informed consent claim that was presented by Georgetown's motion for summary judgment. Judge Rankin's determination that the informed consent claim was time-barred was akin to a grant of summary judgment for the defendants on that theory. "An appellate court

---

**17.** Nor did the amended complaint relate back under Rule 15(c)(3). Under that provision an amendment to add a new party could relate back to the date of the original pleading if, among other requirements, the party knew or should have known that, "but for a mistake concerning the identity of the proper party," the original pleading would have been brought against the party. That requirement was not met here. There was no mistake concerning the identity of Dr. Kobrine.

has discretion to uphold a summary judgment under a legal theory different from that applied by the trial court, and rest affirmance 'on any ground that finds support in the record,' provided it proceeds cautiously so as to avoid denying the opposing party a fair 'opportunity to dispute the facts material' to the new theory." *United States v. General Motors Corp.*, 171 U.S.App. D.C. 27, 48, 518 F.2d 420, 441 (1975) (citations omitted). This principle has been applied where the trial court erroneously relied on the statute of limitations to grant summary judgment. *See, e.g., Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 131, 134–35 (2d Cir.1996); *Lindsey v. Dayton–Hudson Corp.*, 592 F.2d 1118, 1124 (10th Cir.1979).

Nonetheless, it usually will be neither prudent nor appropriate for this court to affirm summary judgment on a ground different from that relied upon by the trial court. "Often it will be wise to deny review because the summary judgment questions are quite separate from the issues resolved by the final judgment, because the trial court is in a better position to reconsider the summary judgment question in light of the disposition on appeal, because the summary judgment issues are not ripe or are not clearly presented by the record, or because it is better to leave to the [trial] court the arduous task of being first to sift through a lengthy summary judgment record." 15B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 2D § 3914.28, at 213–15 (2d ed.1991).

Virtually all these considerations counsel against accepting Georgetown's invitation to uphold the preclusion of the Wagners' informed consent claim on the alternative ground of evidentiary insufficiency. Most important, we think, is the fact that Georgetown relies on testimony that it elicited at trial, after its motion in limine was granted. While Georgetown may have a strong defense to the claim that Mrs. Wagner was misinformed, we are loath to preclude that claim based on the record of a proceeding in which the Wagners were denied a "fair opportunity" to present their side of the issue. *See General Motors*, 171 U.S.App. D.C. at 48, 518 F.2d at 441.

Our concern that the Wagners might be able to rebut Georgetown's evidentiary contentions if they were given a fair chance to prove their informed consent claim at trial, as Judge von Kann concluded, is not merely theoretical. The evidence of record is not as conclusive as Georgetown suggests. On the issue of whether Mrs. Wagner was misadvised about the likelihood of a favorable outcome to her surgery, Dr. Wiesel testified that he told her that a laminectomy (with foraminotomy) together with a spinal fusion would have a 50–60 percent chance of success. Dr. Austin, the Wagners' expert witness, opined that the laminectomy had only a 20–30 percent chance of success. Because Dr. Austin conceded that he would defer to an orthopedic surgeon's opinion as to any additional benefit from the fusion, Georgetown contends that a reasonable jury could not find that a laminectomy with spinal fusion had less than a 50–60 percent probability of success. But Georgetown's own orthopedic expert, Dr. Hanley, testified that a spinal fusion without a laminectomy would have been of only "slight" benefit to Mrs. Wagner.[18] A reasonable jury, crediting Dr. Hanley and Dr. Austin rather than Dr. Wiesel, therefore could conclude that Dr. Wiesel materially overestimated the odds of surgical success.

---

18. Dr. Hanley testified as follows:
 Q. Doctor, if only a fusion, if only a spinal fusion would be performed in this case without laminectomy, what would you have expected with respect to Mrs. Wagner's condition after that operation?

 A. She may have seen slight improvement, some improvement of her back pain, but her leg symptoms would probably be unchanged. As an isolated procedure, that would be inappropriate also.

We are also unconvinced by Georgetown's contention that Dr. Wiesel's advice to Mrs. Wagner could not have been the proximate cause of her injuries. Mrs. Wagner testified that when Dr. Wiesel advised her of the risks of the proposed surgery, she decided to "step back" from the procedure. Only after Dr. Kobrine reassured her, she said, did she resolve to go forward. Georgetown argues that Mrs. Wagner therefore did not rely on Dr. Wiesel's statements in deciding to proceed with surgery. This argument is wide of the mark. "A causal connection exists when, but only when, disclosure of significant risks incidental to treatment would have resulted in a decision against it." *Canterbury v. Spence,* 150 U.S.App. D.C. 263, 281, 464 F.2d 772, 790 (1972).[19] The record in its present state does not establish conclusively that Mrs. Wagner would still have undergone surgery if Dr. Wiesel had told her that there was only a 20–30 percent chance of success rather than a 50–60 percent chance.

"[W]here the correctness of the lower court's decision depends upon a determination of fact which only a jury could make but which has not been made, the appellate court cannot take the place of the jury." *Securities & Exchange Comm'n v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *see also Ibn–Tamas v. United States,* 407 A.2d 626, 635–36 (D.C.1979). We cannot, therefore, affirm Judge Rankin's ruling on Georgetown's motion in limine on the alternative grounds, predicated on evidence adduced at trial, that Georgetown proffers. As to Georgetown, reversal of that ruling is required.

## B. Impeachment of Dr. Austin

The Wagners claim that the trial court erred in allowing Dr. Kobrine to impeach Dr. Austin with his pending censure by the American Association of Neurological Surgery (AANS) for providing unethical testimony as an expert witness in a prior medical malpractice case. We conclude that the trial court ruled correctly on the only objection to the impeachment that the Wagners made, and that other aspects of the impeachment, which might have been subject to objection but were not, are not grounds for relief.

### 1. Procedural Background

During his cross-examination of Dr. Austin, Dr. Kobrine's counsel Mr. Nash asked him if he was a member of the AANS. The Wagners' counsel, Mr. Camenisch, aware of what was coming, immediately asked to approach the bench. There Mr. Camenisch represented to the court that a committee of the AANS had recommended discipline against Dr. Austin based (he said) on the complaint of a doctor against whom Dr. Austin had testified. Mr. Camenisch objected to cross examination of Dr. Austin about that recommendation because the matter was still pending in the AANS and had not been finally resolved. Mr. Nash confirmed that he intended to impeach Dr. Austin with the AANS censure recommendation which, he represented, had been adopted and ratified by the full executive committee of the organization. Acknowledging that he did not know the exact status of the recommendation within the AANS, Mr. Camenisch asked for a proffer and a ruling precluding cross examination about "something that is not final." He added that "if this situation is final, we still would need some evidence. The prejudicial [effect] outweighs the probative value."

The trial court decided to permit a voir dire of Dr. Austin outside the presence of the jury in order to clarify the status of the AANS sanction. In a brief examination conducted by Mr. Nash, Dr. Austin confirmed that both the Ethics Committee and the "full executive committee" of the

---

19. This court agreed with the decision in *Canterbury* and its rationale in *Crain,* 443 A.2d at 562.

AANS had recommended that he be reprimanded for "unethical conduct with regards to providing testimony." Dr. Austin further testified that he had "one more level of appeal," to the full membership of the AANS. Mr. Camenisch did not elect to examine Dr. Austin.[20] No one asked the doctor to reveal the nature of the alleged "unethical conduct" or to describe the events that triggered the AANS disciplinary recommendation.

After the voir dire, the trial court asked for argument. Mr. Camenisch contended that the prejudicial effect of the proposed impeachment outweighed its probative value. The sole reason that he gave for that contention was that there was still a possibility that the full membership of the AANS might reject the censure recommendation and exonerate Dr. Austin.[21] The court rejected this argument, stating that "what's important here is the basis, the reasons for the determination." Concluding that the proposed impeachment had a legitimate bearing on Dr. Austin's credibility, the court decided to permit the questioning, as well as any explanation that might be offered.

When his cross examination before the jury resumed, Dr. Austin acknowledged that the AANS ethics and executive committees had recommended that he be censured for "unethical practices in the giving of testimony." He said that he was appealing the censure to the full membership of the AANS. The Wagners did not object to this testimony, and they did not request a limiting instruction. Dr. Austin was

20. Nor did Georgetown's counsel or the court itself.

21. Because our ruling turns on the fact that counsel advanced no other reason for the court to prohibit the impeachment of Dr. Austin with the AANS disciplinary recommendation, we quote counsel's argument in full:
 MR. CAMENISCH: Your Honor, you know, if there is another level which goes to the full session of the membership, you know, perhaps Dr. Austin will prevail in the case. I submit, Your Honor, the prejudicial effect far outweighs the probative value in this particular situation.

questioned no further about the matter. He was never asked about the circumstances which underlay his AANS discipline, and the jury was never told the specific nature of the "unethical practices" in which he allegedly engaged.

### 2. Analysis

"[A] witness may be cross-examined on a prior bad act that has not resulted in a criminal conviction only where (1) the examiner has a factual predicate for the question, and (2) the bad act bears directly upon the veracity of the witness in respect to the issues involved [i]n the trial." *Portillo v. United States,* 609 A.2d 687, 690–91 (D.C.1992) (citations and internal quotation marks omitted). The trial court "is vested with broad discretion" in deciding whether to permit such cross examination. *Murphy v. Bonanno,* 663 A.2d 505, 509 (D.C.1995) (quoting *Roundtree v. United States,* 581 A.2d 315, 323 (D.C.1990)). In exercising that discretion, the trial court should assess both the sufficiency of the examiner's factual predicate and the relevance of the prior bad act to the witness's veracity. The court should also evaluate whether the probative value of the proffered cross examination is substantially outweighed by the danger of unfair prejudice. *See (William) Johnson v. United States,* 683 A.2d 1087, 1099 (D.C.1996) (en banc); *see also Clayborne v. United States,* 751 A.2d 956, 962–64 (D.C.2000) (discussing test in context of cross examination for bias).

We've not objected at all. He's going back 7, 8 years in this particular case. But, if there's a chance in this particular case, that Dr. Austin may be vindicated, there may be a reversal, who knows.
It's my understanding that the person who has registered the complaint was found negligent and went on a war path. I mean, this happens. Maybe the general membership will see the matter in favor of Dr. Austin.
With that possibility, Your Honor, I think the prejudicial effect far outweighs the probative value.

■ Challenging the impeachment of Dr. Austin on appeal, the Wagners contend that the trial court abused its discretion in failing to inquire or make findings regarding the factual predicate for the impeachment, the relevance of the AANS censure to Dr. Austin's credibility, and the probative value of the evidence versus the danger of unfair prejudice. In making these claims, the Wagners emphasize especially that the nature of Dr. Austin's supposedly "unethical practices" in testifying was never disclosed.

The only reason, however, that the Wagners gave the trial court for resisting the impeachment of Dr. Austin was that the AANS censure was on appeal and not yet final. By itself that reason, though arguably relevant to the court's evaluation of the factual predicate for the impeachment and the danger of unfair prejudice, was insufficient. The Wagners presented no evidence to show that the censure would be reversed on appeal. Even if the censure recommendations of the ethics and executive committees of the AANS were not the last word on the subject, they were a more than sufficient factual predicate for the proposed cross examination of Dr. Austin. *See Clayborne,* 751 A.2d at 963 (factual predicate requirement is flexible and lenient). Similarly, the fact that an appeal was still pending did not without more give rise to a presumption that cross examination about the prior bad act in question would be unfair. *Cf.* D.C.Code § 14–305(d) (1995) (pendency of an appeal from a conviction does not render evidence of that conviction inadmissible for purposes of impeachment, though evidence of pendency of appeal is also admissible); *accord, Hale v. United States,* 361 A.2d 212, 214–15 (D.C.1976).

The Wagners failed to make their other arguments in the trial court. The Wagners did not dispute that the "unethical practices" of which Dr. Austin was accused bore directly on his veracity, and they made no attempt to adduce evidence to disprove the accusation on its merits.

Apart from their suggestion that Dr. Austin's appeal to the full membership of the AANS might turn out to be successful, the Wagners did not argue that Dr. Kobrine's counsel lacked an adequate factual predicate to examine Dr. Austin, or that his impeachment would result in unfair prejudice. Furthermore, the Wagners did not contend that the court needed to make further inquiry into the underlying facts before it ruled on the proposed impeachment.

■ "As a general rule, matters not properly presented to a trial court will not be resolved on appeal." *Williams v. Gerstenfeld,* 514 A.2d 1172, 1177 (D.C.1986); *see Miller v. Avirom,* 127 U.S.App. D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967) ("[q]uestions not properly raised and preserved during the proceedings under examination, and points not asserted with sufficient precision to indicate distinctly the party's thesis, will normally be spurned on appeal"). This rule is especially applicable to a litigant's failure to make an objection to evidence "promptly and specifically," at a time when it might be possible for the opposing party to meet its force or for the trial court to cure any omission or error. *In re T.H.B.,* 670 A.2d 895, 902 (D.C.1996) (quoting John W. Strong, McCormick on Evidence § 55, at 221 (4th ed.1992)). "A court deviates from this principle only in exceptional situations and when necessary to prevent a clear miscarriage of justice apparent from the record." *Williams,* 514 A.2d at 1177.

■ We perceive no just reason to deviate from the waiver rule in this case. The Wagners had a fair chance to be heard, and there is no evidence that the impeachment of Dr. Austin was in fact misleading. Counsel for the Wagners was not caught by surprise; he was aware ahead of time that the defense might seek to impeach Dr. Austin based on the AANS censure recommendation, and he was aware of the factual basis of that recommendation. In such circumstances it is fair to presume that counsel's decision to

raise certain arguments and not others was an informed one. Moreover, if counsel thought the court needed more information about the AANS censure to assess the probative value or the prejudicial effect of the proposed impeachment, he had the opportunity to voir dire Dr. Austin and elicit that information. It was counsel's choice—perhaps a deliberate tactical decision in order to blunt the impact of the impeachment—not to make use of that opportunity. If the Wagners had made their objections known in the trial court, Dr. Kobrine and Georgetown might well have been able to meet them. For example, it would have been easy to rectify the failure to ascertain the nature of Dr. Austin's allegedly "unethical practices" in testifying had that issue been raised while Dr. Austin was still available for examination.[22]

Accordingly, we reject the Wagners' challenges to the impeachment of Dr. Austin. As the issue was presented and argued to the trial court, however, we cannot find that the court exercised its discretion erroneously.

## C. Rulings on the Admission of Expert Testimony

The Wagners challenge two discretionary rulings of the trial court on the admission of expert testimony on the issue of causation. The first ruling permitted a defense expert witness to testify despite a claim by the Wagners of unfair surprise. The second ruling precluded the Wagners from presenting expert testimony in rebuttal. Whether these rulings were sound or not, the special verdict that the jury rendered enables us to say that they did not affect the outcome of the trial. Any errors in the rulings were therefore harmless and do not entitle the Wagners to relief.

### 1. The Rulings in Context

The issue of causation arose in connection with the Wagners' claim that Dr. Kobrine was negligent in the performance of the foraminotomy during his portion of the surgery on Mrs. Wagner. The Wagners' expert witness, Dr. Austin, opined that Dr. Kobrine breached the applicable standard of care by using a rongeur—a type of forceps used to nip away bone—that was too large for the tight opening (the foramen) in which it had to be inserted. Specifically, Dr. Austin opined that Dr. Kobrine used a rongeur with a width of three millimeters, when he should have used a narrower instrument to avoid impinging on

---

**22.** Because the relevance of Dr. Austin's "unethical" conduct to his veracity depended on exactly what he did wrong, it would have been better had that information been revealed. It is apparent, though, that all parties and the trial court itself inferred that the AANS committees found that Dr. Austin had testified falsely or dishonestly (which if true would have borne directly on his credibility), rather than carelessly, mistakenly or contrary to some principle of solidarity among neurosurgeons (which would not have borne directly on Dr. Austin's truthfulness). That inference was reasonable—all the more so because Mr. Camenisch and Dr. Austin himself made no effort to dispel it—and we do not fault the trial court for drawing it.

We note that when Dr. Austin was impeached, he was not asked whether he had testified dishonestly in such-and-such a trial. Rather, he was asked whether the AANS had found that he had testified dishonestly ("unethically"). Asking Dr. Austin about the AANS finding of wrongdoing arguably contravened the rule against hearsay and the rule against proving uncharged acts of misconduct by extrinsic evidence. *See Sherer v. United States,* 470 A.2d 732, 738 (D.C.1983); Stephen A. Saltzburg, *Impeaching the Witness: Prior Bad Acts and Extrinsic Evidence,* 7 Crim. Just. 28, 30 (Winter 1993) ("Any time a questioner ... seeks to elicit the beliefs or actions of a person other than the witness being examined to suggest that the other person has a different view of the prior act from the witness, the questioner is seeking to inject extrinsic evidence into the case."). *See also United States v. Davis,* 197 F.3d 662, 663 n. 1 (3d Cir.1999) (" 'counsel should not be permitted to circumvent the no-extrinsic-evidence provision ... by tucking a third person's opinion about prior acts into a question asked of the witness who denied that act.' ") (quoting Saltzburg, 7 Crim. Just. at 31). As the Wagners have not challenged the impeachment of Dr. Austin on this ground, we do not examine this question further.

key blood vessels.[23] Dr. Austin opined that by using a rongeur that was too large, Dr. Kobrine must have compressed, inadvertently, an artery known as the Artery of Adamkiewicz, shutting off the blood supply to Mrs. Wagner's spinal cord and thereby causing her paralysis.[24]

Dr. Kobrine denied that he breached the standard of care by using too large a surgical instrument. He testified that, consistent with his customary practice, he performed the foraminotomy with a two millimeter rongeur, not a three millimeter rongeur.[25] Dr. Kobrine also denied that he could have injured the Artery of Adam-

kiewicz. His expert witness Dr. Dennis, a neurosurgeon, disputed Dr. Austin's opinion that the Artery of Adamkiewicz could have been present, even with a low probability, in Dr. Kobrine's operating field. Dr. Dennis opined that there was "no way that [Dr. Kobrine] physically could have compressed that particular artery."[26]

After Dr. Dennis testified, Dr. Kobrine called a second neurosurgeon, Dr. Dohrmann, to the witness stand. The Wagners objected on grounds of unfair surprise to any testimony by Dr. Dohrmann regarding their theory of negligent injury to the Artery of Adamkiewicz.[27] The trial court

23. When pressed on cross examination, Dr. Austin was unable to point to any evidence that Dr. Kobrine in fact did use a three millimeter rongeur to perform the foraminotomy, and eventually said that he relied on what he had been told by the Wagners' counsel. However, Dr. Kobrine's operating report stated that he used a three millimeter instrument to perform the laminectomy portion of the surgery, and the Wagners contended that it could be inferred that he used the same implement for the foraminotomy.

24. There was no direct evidence that Dr. Kobrine injured the Artery of Adamkiewicz. Moreover, as Dr. Austin acknowledged, there was only a five percent chance or less that the Artery of Adamkiewicz was present at the site at which Dr. Kobrine operated. (The artery may enter the spinal cord at various points. The point of entry in Mrs. Wagner's case was never determined, because that would have required an invasive procedure that was medically inadvisable.) In lieu of direct evidence of injury to the artery, and despite the low probability that the artery was located at the operative site, Dr. Austin relied upon an inferential process of elimination to conclude that the cause of Mrs. Wagner's paralysis must have been trauma to that artery during the foraminotomy. Dr. Austin's reasoning paralleled that of Sherlock Holmes: "when you have eliminated the impossible, whatever remains, *however improbable,* must be the truth." Sir Arthur Conan Doyle, The Sign of Four in 1 Sherlock Holmes: The Complete Novels and Stories 107, 139 (Bantam Books 1986) (1889) (emphasis in the original). Outside of detective fiction, this is difficult reasoning on which to prevail.

25. Dr. Austin testified that he had "no opinion" whether use of a two millimeter rongeur

would violate the standard of care, and there was no evidence that it would.

26. Dr. Dennis did concur with Dr. Austin that the "most likely" cause of Mrs. Wagner's paralysis was an arterial spasm, "probably" of the Artery of Adamkiewicz, that was attributable in some unknown way to the surgery (but not to Dr. Kobrine). Dr. Dennis identified several possible sources of non-negligent arterial trauma during surgery, including the spread of heat from an instrument used to cauterize blood vessels, surgical manipulation, and blood loss.

27. In his initial disclosure statement pursuant to Super. Ct. Civ. R. 26(b)(4), Dr. Kobrine identified Dr. Dohrmann as an expert who might testify on the standard of care and causation issues. [R. 481] Subsequent to that statement, Dr. Austin developed the theory which the Wagners pursued at trial, that Dr. Kobrine caused Mrs. Wagner's paralysis by injuring her Artery of Adamkiewicz while performing the foraminotomy with an inappropriate rongeur. Judge von Kann granted the Wagners leave to file a second amended complaint which incorporated this new theory, authorized defense counsel to reopen Dr. Austin's deposition to examine him about it, and directed the defendants to file a supplemental disclosure statement to "identify any expert witness testimony which will respond to Dr. Austin concerning his new opinion." Dr. Kobrine filed a supplemental statement in which he named Dr. Dennis as an expert who would "offer opinions refuting the testimony as offered by Dr. Austin that Dr. Kobrine's neurosurgical conduct caused or contributed to an infarction in the spinal arteries." The supplemental statement did not name Dr. Dohrmann specifically, but did state in a footnote that Dr. Dennis was identified "in addition to those expert witnesses previously iden-

overruled the objection, finding that the Wagners were sufficiently on notice that Dr. Dohrmann's testimony might address that claim. Dr. Dohrmann thereupon testified, among other things, that trauma to the Artery of Adamkiewicz could not have been the cause of Mrs. Wagner's paralysis because she tested positive for proprioception—the sense of position—in her feet following the surgery. According to Dr. Dohrmann, occlusion of the Artery of Adamkiewicz would, as a matter of basic anatomy, have shut off blood to the spinal cord so completely that Mrs. Wagner would have lost all capacity for proprioception.[28]

To rebut Dr. Dohrmann on this narrow but telling point, the Wagners sought to call a professor of anatomy and neurobiology named Dr. Traurig. The Wagners proffered that Dr. Traurig would testify that Dr. Dohrmann had overlooked the fact that proprioception can survive blockage of the Artery of Adamkiewicz because blood is supplied to the posterior portion of the spinal cord by other arteries. The court considered, however, that the Wagners had been aware of the proprioception issue before trial began (having consulted with Dr. Traurig about it), and that they should not have been surprised by Dr. Dohrmann's testimony. (By implication, the Wagners could have addressed the issue in their case-in-chief.) The court also considered the proprioception issue to be collateral to the primary issues (e.g., whether there was a breach of the standard of care) raised by the surgical negligence claim against Dr. Kobrine. In light of these considerations, and desiring not to prolong the trial unduly, the court denied the Wagners permission to call Dr. Traurig in rebuttal (or in the alternative, to recall Dr. Austin).

## 2. The Jury Verdict

To recapitulate, the Wagners' theory of negligence on the part of Dr. Kobrine in the actual performance of the surgery on Mrs. Wagner was that Dr. Kobrine used a three millimeter rongeur to perform the foraminotomy; that his use of a three millimeter rongeur to perform the foraminotomy breached the applicable standard of care; and that this breach resulted in trauma to Mrs. Wagner's Artery of Adamkiewicz, shutting off the blood supply to her spinal cord and proximately causing her paralysis. The *only* standard of care that Dr. Kobrine was charged with breaching in the performance of the surgery was the standard for the size of instrument to use in the foraminotomy.

All three components of the Wagners' surgical negligence claim were in dispute. The trial court accordingly instructed the jury without objection by the Wagners that to find Dr. Kobrine negligent in the performance of surgery on Mrs. Wagner, it would have to determine that he used a three millimeter surgical tool to perform the foraminotomy, that the use of a three millimeter surgical tool breached the standard of care, and that such a departure from the standard of care was a proximate cause of injury to Mrs. Wagner. The verdict form, to which the Wagners agreed, mirrored the court's instructions, asking the jury whether it found by a preponderance of the evidence that Dr. Kobrine used a three millimeter instrument, that he breached the applicable standard of care during the performance of the foraminotomy, and, if so, that his breach proximately caused the plaintiffs' damages. *See* Super. Ct. Civ. R. 49(a), which permits the court to require the jury to return a special

---

tified in this matter." At trial the Wagners argued that this footnote failed to disclose to them that Dr. Dohrmann would testify on the arterial infarction theory, that as a result they did not take his deposition, and that they would be unfairly surprised by his testimony.

**28.** In the opinion of Dr. Dohrmann, Mrs. Wagner's paralysis was caused by a vasospasm (i.e., a sharp contraction) of the anterior spinal artery, something that was known to occur "probably with a frequency of less than one in 10,000 or more" during operations on the spine or spinal cord.

verdict "in the form of a special written finding upon each issue of fact."

In rendering a defense verdict, the jury answered the first two questions in the negative. It found that the Wagners failed to prove that Dr. Kobrine had used a three millimeter rongeur to perform the foraminotomy, and therefore also found that he did not breach the applicable standard of care. As a result, in accordance with the instructions on the verdict form, the jury did not reach the question of proximate cause.

### 3. Harmless Error Analysis

 "Our aim in assessing whether trial court error requires reversal must be to do 'substantial justice,' and '[t]he court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.' Super. Ct. Civ. R. 61." *R. & G. Orthopedic Appliances & Prosthetics, Inc. v. Curtin,* 596 A.2d 530, 538 (D.C. 1991). In that case this court approved for use in civil cases the test for harmless error articulated by the Supreme Court in *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946): whether we can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *See R. & G. Orthopedic,* 596 A.2d at 539–40.

 The trial court's rulings permitted Dr. Dohrmann to testify without contradiction that Dr. Austin's theory of causation via injury to Mrs. Wagner's Artery of Adamkiewicz was anatomically impossible because she retained proprioception following her surgery. Contending that Dr. Dohrmann's anatomy lesson was flawed, and that the court abused its discretion in allowing it to come in to their surprise and

without rebuttal, the Wagners claim that the court's rulings harmed their case substantially. Their foremost contention is that the rulings were harmful because Dr. Dohrmann's unrefuted testimony "eliminated, for all practical purposes," their theory of surgical negligence on the part of Dr. Kobrine because it negated the critical element of causation. The Wagners also contend that the rulings allowed Dr. Dohrmann to undermine Dr. Austin's credibility without opportunity for rejoinder, while preventing them from impeaching Dr. Dohrmann's credibility by showing that his opinion was erroneous.

On the record before us, we are persuaded that the Wagners were not materially prejudiced by the court's rulings. Testimony about whether Mrs. Wagner's paralysis could have resulted from trauma to the Artery of Adamkiewicz went solely to the question of causation, not to the antecedent question of whether Dr. Kobrine breached the standard of care by using a three millimeter rongeur during the foraminotomy. But the jury answered that antecedent question in favor of Dr. Kobrine, finding that the Wagners failed to prove that Dr. Kobrine used a three millimeter instrument. The jury was therefore not required to reach the question of causation, and it did not do so. Furthermore, the jury's failure to find that Dr. Kobrine used a three millimeter rongeur was not attributable to its assessment of the credibility of either Dr. Austin or Dr. Dohrmann, because neither expert offered testimony that was probative on that issue.[29] Testimony about whether injury to the Artery of Adamkiewicz caused Mrs. Wagner's paralysis was therefore immaterial to the jury's verdict in favor of Dr. Kobrine on the issue of surgical negligence. We can therefore say with the requisite fair assurance that the court's rulings did not substantially sway the jury

---

**29.** Although Dr. Austin opined that Dr. Kobrine violated the applicable standard of care by using a three millimeter rongeur, he could offer no factual basis for his belief that Dr.

Kobrine used such an instrument. Rather, he testified that he relied on what he had been told by the Wagners' counsel. *See* note 25, *supra.*

or affect its verdict.[30] If there was error in those rulings, the error was harmless.

### III.

In conclusion, because we reject the claims of error with respect to the impeachment of Dr. Austin, the admission of Dr. Dohrmann's testimony, and the preclusion of rebuttal testimony, we affirm the verdict of the jury in favor of Dr. Kobrine and Georgetown on the claims that were submitted to it. Dr. Kobrine's claim in his cross appeal, that he was entitled to judgment in his favor in any event, on the ground that the Wagners failed to establish a prima facie case against him, is therefore moot and we refrain from addressing it.

Because we conclude that under the doctrine of relation back set forth in Super. Ct. Civ. R. 15(c)(2), the Wagners' informed consent claim was timely as to Georgetown, but not as to Dr. Kobrine, we reverse the trial court's ruling as to Georgetown's motion in limine, and affirm that ruling as to Dr. Kobrine's motion. As to Georgetown only, therefore, this case is remanded for further proceedings consistent with our opinion.

*So ordered.*

---

**30.** It is not suggested, and we do not think it would be plausible to suggest, that the trial court's rulings were materially prejudicial to the Wagners' alternative theory of liability, that Dr. Kobrine and Dr. Wiesel never should have performed the surgery in the first place. Although there was a dispute about the role of the Artery of Adamkiewicz, there was no dispute that the surgery was, in some way, the proximate cause of Mrs. Wagner's paralysis. Both Dr. Dennis and Dr. Dohrmann opined that an arterial infarction of some kind attributable in some way to the stresses of surgery (though not to any fault on the part of the doctors in performing the surgery) was the cause of Mrs. Wagner's paralysis. The jury did not conclude otherwise. According to the jury verdict form, the jury did not reach the question of proximate causation on the Wagners' inappropriate surgery claim, because it did not find that the defendants had breached the applicable standard of care by performing surgery that should not have been performed. Ample evidence supported that judgment.